## Richmond.

## SMITH v. SNYDER.

### April 26th, 1883.

1. SALES—*Postponement of delivery—Breach—Damages.*—Where delivery is postponed at buyer's request, and then breach occurs, this postpones date of breach in reference to the time at which damages therefor shall be fixed.

2. IDEM—*Delivery on event—Non-delivery before event—Case at bar.*—In September, 1879, J. sold A. old iron rails to be delivered immediately after delivery thereof to J. by York River Railroad Company at Richmond dock, at $28 a ton. Company failed to make complete delivery as soon as was expected, but made partial deliveries during several months, and the rails so delivered were, as fast as delivered, turned over to A., who, though constantly complaining of the delay, and told he might drop the contract, by J., by whom no indulgence was ever asked of A., accepted same. Iron was rapidly rising in price. A. continued to urge the delivery and J. to promise to deliver as fast as the company delivered to him, and to press the company to deliver. On 19th January, 1880, only a few days after J.'s last delivery, A. demanded immediate delivery of the residue, one hundred and ten tons, on threat to buy in open market and charge difference to J. On 5th February, 1880, A. declared the contract at an end, bought one hundred and ten tons of old iron in rails in market, at $44 per ton, presented his account for difference between that and the contract price to J., who refused to pay it. On 20th February, 1880, J. received several car loads more of rails from the company, and offered same to A., who refused to accept them. Afterwards A. sued J. and recovered judgment for $1,750.79 and costs. At trial several instructions were asked for by each party. All were refused and others given. For those asked for by defendant and refused, and those given by the court, see opinion. Of the former the first is as follows, viz: "First. The court instructs the jury that if they believe that the contract between the parties was that defendant was to deliver to plaintiff one hundred and fifty tons of iron as soon as he could get it from the York River Railroad Company, and was

to receive $28 per ton therefor, and that he did offer to deliver to plaintiff so much of said iron as he received from the company, and as soon as he so received it, and that plaintiff, after accepting part of said iron, refused to receive any more, then they are to find for defendant." The second is substantially the same.

HELD:

1. The first and second instructions asked for by the defendant, correctly propound the law, and are founded on evidence which was before the jury, and which tended to prove the case therein supposed, and should have been given.

2. It is unnecessary to notice the other instructions asked for by the defendant.

3. The instructions given by the court, are, in the abstract, correct, but are predicated upon evidence not before the jury, and tended to mislead and confuse them.

Error to judgment of circuit court of the city of Richmond, rendered 27th November, 1880, in an action of trespass on the case in *assumpsit*, wherein Asa Snyder is plaintiff, and James C. Smith is defendant. The object of the suit is to recover the sum of $1,750.79, the sum paid by plaintiff for 110 tons of old iron rails, at $44 per ton, over the price, $28 per ton, at which defendant contracted to deliver, but failed to deliver the same to plaintiff. The jury rendered a verdict for plaintiff for the amount claimed, with interest from the date thereof, and judgment was given accordingly.

At the trial, both plaintiff and defendant asked for instructions, which were refused, but instead thereof the court gave certain instructions, to its giving whereof, as well as to its refusing to give those asked for by himself, the defendant excepted. The facts and the instructions asked for by the defendant, and those given by the court, are fully set out in the opinion of the court.

*Meredith & Cocke,* for the appellant.

*Guy & Gilliam,* and *Jackson Guy,* for the appellee.

RICHARDSON, J., delivered the opinion of the court.

Some time in the early part of September, 1879, James C. Smith bought of the York River Railroad Company about three hundred tons of old rail iron, to be delivered in Richmond at the earliest moment consistent with said company's engagements. Soon after Smith's purchase, Asa Snyder, then being on a visit to the state of Ohio, telegraphed his son, A. K. Snyder, in Richmond, to purchase all the old rail he could get on the Richmond market at $26.50 per ton. A. K. Snyder, on the 15th day of September, 1879, wrote to Smith, offering him $26.50 per ton for all the old rail he *had in stock.* Smith declined the offer because too low. After this, Smith proposed to young Snyder to sell his father three hundred tons at $28 cash, to be delivered on the dock in Richmond.

On the 19th of September, 1879, Snyder returned from Ohio, when his son informed him of Smith's previous offer to sell said three hundred tons. Snyder told his son to make the purchase, and to have the matter in writing. On the 20th of September, 1879, Snyder wrote Smith a note purporting to accept Smith's previous unaccepted offer to sell said three hundred tons; but, before sending the note, received from Smith a note, saying he had secured the iron at $28, and would deliver it on the "dock" for $28 cash. Snyder thereupon sent, by his son, said note previously written, to Smith. Young Snyder returned and informed his father that Smith would sell only one hundred and fifty tons. He did not say he had even purchased the one hundred and fifty tons. This was on the 20th of September. Up to and including this day what has been stated is all that had occurred in the direction of a contract. Certainly, in strictness, what had passed did not amount to a contract. But Snyder, who seemed keen to buy iron, had, even in advance of his note to Smith, and evidently acting on the information derived from his son as to Smith's offer to sell three hundred tons, telegraphed to the Lawrence Iron Company, of Ohio, offering to sell it the three

hundred tons. This was premature, if Snyder was simply re-lying upon Smith's previous unaccepted offer.

When on same day (20th September) Snyder got the information from his son that Smith would only sell one hundred and fifty tons, he, without doing or saying anything amounting, in fact, to an acceptance of Smith's offer as to the one hundred and fifty tons, at once telegraphed the Lawrence Iron Company that he would only sell it one hundred and fifty tons. This again was premature.

It is not claimed by Snyder that Smith had any knowledge of his dealings with said Lawrence Iron Company. Nor is it claimed that Colonel Douglas, superintendent of the York River Railroad Company, had any knowledge of the transactions between Smith and Snyder. It does appear, however, from a letter from Snyder to Smith, hereinafter to be referred to, that Snyder did have information that Smith had made the aforesaid purchase of old rail from the York River Railroad Company, from which, in connection with other facts, the inference may fairly be drawn that he purchased from Smith with the knowledge that his delivery was dependent upon the delivery of said railroad company to him.

The important question is, what was the contract between the parties? On the part of Snyder, the contention is, that what occurred on the 20th of September, and terminating with Snyder's note to Smith of that date, amounted to a contract for the sale and delivery by the latter to the former of one hundred and fifty tons of iron, without any time specified for delivery. On the part of Smith, it is insisted that the understanding, acquiesced in by Snyder, was that Smith should deliver the iron to Snyder as he, Smith, received it from said railroad company. To determine the question thus in dispute, we can look only to the evidence.

The only witnesses whose testimony is important, are Snyder, his son, A. K. Snyder, and Smith. From their testimony we must extract the true character, if possible, of the con-

tract. Snyder, it must be borne in mind, does not claim to have been, nor was he present on the 20th of September, when his note of that date was delivered by his son to Smith. Young Mr. Snyder says that when he delivered his father's note, Smith said he would only sell one hundred and fifty tons. He says further that Smith did not say from whom he would get the rails; that he, Snyder, thought they were coming by vessel, as the "dock" was mentioned as the place of delivery. This, so far as shown by the record, is all that occurred on that day. Does it amount to a contract? If not, what else is there in the record to throw light upon our path. A. K. Snyder says that a few days after the contract was concluded (precisely what the contract was, or when made he does not say), his father sent him to enquire when the rails would be delivered; that he was informed by Smith that he was not ready to deliver them, and he went down a second time for the same purpose, and on *one of these* occasions Smith said he would deliver as soon as he could get the iron from the railroad company, that he was dependent upon Colonel Douglas; and that soon after, Smith sent his father (Snyder) the letter of Colonel Douglas; that his father was dissatisfied with Colonel Douglas' letter. The letter of Colonel Douglas was addressed to Smith, and bore date, September 30, 1879. It informed Smith that Douglas could not fix a date for delivery to him, but would deliver as soon as practicable. Snyder did not disclaim his dependence upon the terms contained in that letter, but to all appearances acquiesced therein. Time after time for some months, Snyder, through his son or by note in writing, enquired when Smith could deliver the rails. Smith all the while urging Colonel Douglas to deliver to him, and uniformly asserting his dependence upon Douglas, and always forwarding promptly to Snyder any and all information from Douglas upon the subject.

In a communication received by Smith from Douglas, the latter said he would deliver some iron in three weeks, and Smith forwarded this note of Douglas' to Snyder, who chose to treat.

that act as a request for indulgence by Smith; and on the 11th of October, 1879, wrote Smith saying he had expected immediate delivery, but pretended to extend the indulgence. Again, on the 30th October, he wrote to same effect, and reminded Smith that the time of indulgence was out. Yet in his evidence he says that his letter of October 11th, claiming that indulgence had been asked for by Smith, "was caused by a message from Smith, *or by a letter* sent by *him* from Douglas, that he (Douglas) would deliver in three weeks. And Smith says he never asked for indulgence, but simply forwarded Douglas' letter to Snyder. This effectually disposes of the matter of indulgence so far as Smith is concerned.

The record contains a voluminous correspondence between Snyder and Smith, in all which Smith consistently and persistently asserts that he had no other source than said railroad company from which he could make delivery to Snyder, and that he made the sale to him with reference thereto. True, he says, he is not positive that he said to either of the Snyders, on or prior to September 20th, that his delivery to Snyder was dependent upon said company's delivery to him; but he says he had no reason to conceal his source of supply, and he supposes he did tell Snyder. Snyder, on the contrary, presents his view of the contract in different and conflicting aspects. Sometimes we find him claiming that the contract was for immediate delivery; at other times that it was for delivery in a short time thereafter. Neither view is sustained by the evidence in the cause. And it is incredible that he could have expected immediate delivery when in his testimony he says that Smith did not tell him, nor did he know, where Smith *was to get* the iron from; that he did not tell him from whom he would get it, and that he expected *immediate delivery* when the contract was made, and from the place of delivery named he thought the iron was *coming by sail*. His own statement shows that he could not have expected immediate delivery. But it is still more incredible inasmuch as he was not present on the day on

which he claims the contract was made, and therefore he had no means of knowing what transpired on that day, except as communicated to him by his son; and what was said by his son has already been stated in full.

On the 8th of November, Colonel Douglas wrote Smith: "I am expecting to ship three hundred tons of rail from Philadelphia next week; as soon as it arrives and I can lay it, I will deliver your rail." This letter Smith forwarded to Snyder. Snyder replied, complaining, not of Smith, but of Douglas; and among other things says: "Colonel Douglas' note means nothing. * * * * Was he not expecting these rails when he authorized your sale? * * * * It is now about two months since these rails were offered for sale." This adds conclusiveness to the fair inference to be drawn from other circumstances, that Snyder knew all the time of the arrangement between Smith and the railroad company, and knew that Smith's delivery to him was dependent upon the movements of said company.

From the 8th of November, 1879, the date of Snyder's letter last referred to, to the 5th day of January, 1880, Snyder frequently urged Smith to deliver the iron. Smith, in turn, constantly plied Colonel Douglas with earnest solicitations to the same end. Within this period, said railroad company delivered to Smith something over forty tons of iron, every pound of which Smith promptly turned over to Snyder. Iron was now rapidly rising in price. Smith was still urged by Snyder to deliver more; and notwithstanding the rapid rise in price, he, Smith, assured Snyder that he should have every pound his contract called for, as fast as delivered by the company, though iron should reach $100 per ton. Surely all this indicates anything else but a disposition on Smith's part to evade his contract.

Nearly four months had elapsed since the contract was made. In all this time, Snyder had not once directly disclaimed the view of the contract insisted on by Smith from first to last; in fact, he had, for all practical purposes, acquiesced in that view.

The question is, who was right about it? Looking at all the evidence, taking into consideration each and every circumstance, we think that what transpired on the 20th day of September, 1879, did not amount to a contract in contemplation of law. We are of opinion that the matter was left open, and that either party was at liberty to stand or not until a few days afterwards, when A. K. Snyder went, as he says, to see Smith as to when he would make delivery, and that Smith being still willing, the contract was then completed, and that then the delivery feature, as dependent upon said company's delivery to Smith, as well as the contract in all other particulars, for the first time became definite and fixed.

If this be not the way in which this most irregular proceeding culminated, first in agreement and then in disagreement, the record may be searched in vain for the essential elements of a contract.

On the 19th day of January, 1880, only a few days after Smith's last delivery, Snyder demanded immediate delivery of the residue by Smith, and notified him that on failure to comply he would buy in open market and hold Smith responsible for the difference between the then market price and the contract price. To this Smith made no reply, because, as he says, he had done all he had promised to do.

Snyder on the 5th day of February, 1880, declared the contract at an end, bought at $44 per ton an amount of iron sufficient to supply the amount not delivered under his contract with Smith, made out his account and presented it to Smith for payment, which was refused.

On the 20th day of February, 1880, Smith learned that Colonel Douglas would deliver him several car-loads of iron that day; he immediately notified Snyder of the fact and offered it to him. Snyder refused to receive it, and afterwards sued Smith and recovered judgment, as before stated. At the trial of the cause several instructions were asked for by the plaintiff and defendant respectively, all of which were refused and others given in lieu

thereof by the court. To the action of the court refusing the instructions asked for by him and giving others instead, the defendant excepted.

The instructions asked for by the defendant are:

"First. The court instructs the jury that if they believe that the contract between the parties was that the defendant was to deliver to the plaintiff one hundred and fifty tons of iron as soon as he could get it from the York River Railroad Company, and was to receive $28 per ton therefor, and that he did offer to deliver to the plaintiff so much of said iron as he, the said defendant, received from said company, and as soon as he so received it, and that the plaintiff after accepting a part of said iron, refused to receive any more, then they are to find for the defendant."

"Second. If the jury believe from the evidence that nothing was agreed upon between the parties about the time for the delivery of the iron, but that the plaintiff, or his agent, was informed by the defendant, at or about the time the said contract was agreed on, that he, the defendant, was to get the iron from the York River Railroad Company, and that he was dependent upon said company as to when it would be delivered, and further believe that the defendant did, as soon as he received any of the iron from the said company, offer to deliver it to the said plaintiff, who, after receiving a part, refused to accept any more, then they are to find for the defendant."

"Third. And the court further instructs the jury that if they should find for the plaintiff, that they are to assess the damages at a sum that is the excess, if any, of the market price of one hundred and ten tons of old iron rail on the first day of November, 1879, over the contract price for the same."

"Fourth. But if the jury should believe, that after the contract was completed, the said Snyder demanded the delivery of the iron, and was then informed by the said Smith that he was to receive the iron from the York River Railroad Company, and could not deliver it until it was so received, and furnished said

Snyder with the letter of Douglas, refusing to fix a time of delivery, and at the same time offered to release said Snyder from the contract, and said Snyder afterwards demanded said iron, and actually received all the rail Smith received from said company, then the said Snyder acquiesced in the arrangement between said Smith and said company, and agreed to accept the iron as Smith received it from the company, and is not entitled to recover of said Smith in this suit, unless the jury shall believe that said Smith refused to deliver any portion of the iron he received from said company. And in that event, the measure of his damages is the difference between the contract price of said iron and its market value at the time Smith refused to deliver the iron received by him from the said company."

From the view of the contract in this case already expressed, it was clearly error in the court below to refuse said first and second instructions asked for by the defendant. They are practically but one in effect. They address themselves to the contract in evidence before the jury, and ask simply a response from the jury upon plain matters of fact. They are each founded on evidence which was before the jury, which evidence at least tended to prove the case supposed. *Hopkins Bro. & Co.* v. *Richardson*, 9 Gratt. 486; *Farish* v. *Reigle*, 11 Gratt. 697.

For the reasons already expressed, it is deemed unnecessary to pass upon the defendant's third and fourth instructions.

The court below gave the jury these instructions:

"First. If the jury believe from the evidence that no definite time for delivery of the iron was agreed upon between the plaintiff and the defendant in their original contract, they are instructed that the plaintiff had a right to demand the delivery after a reasonable notice of the time when delivery would be required. And the defendant had a right to tender delivery after a similar notice from himself of the time when he proposed to make the delivery. And upon default after such notice of the defendant to deliver or the plaintiff to accept, the other

party had a right to declare the contract broken, and to claim damages to the full extent of the difference between the market price at the time and the price agreed upon in the contract."

In the abstract this instruction is correct. But it is plainly, in view of the evidence, obnoxious to the objection of ambiguity, and calculated to lead the jury away from the proper consideration of the evidence in the cause. It evidently proceeds upon the idea of an original contract without any specified time for delivery, and the consequent right to give reasonable notice of the time when delivery would be required. All of which would be well enough, with the consequences incident to a failure to perform, after such notice, provided no evidence existed in the case, showing or tending to show, that the contract was different from that supposed in the instruction. That such is the leading thought presented by the instruction is manifest from the last clause, which assumes that the contract was such as supposed, by stating that after such notice and failure to deliver, the party in default would be liable to the other to the full extent of the difference between the market price at the time of such notice and the contract price. The instruction, moreover, in referring to what is termed the *original* contract, thereby faintly admits the existence of evidence tending to show a different contract, but fails to propound the alternative proposition and instruct thereon. The instruction is evidently predicated upon Snyder's letter of the 11th and 30th days of October, 1879, attempting to show that indulgence, as to time of delivery, had been extended to Smith upon his request, and that the measure of his liability was fixed when Snyder notified him that the contract was at an end, to-wit, on the 5th day of February, 1880.

It is sufficient to say that such a conclusion is unwarranted by the facts. There is not an iota of evidence in the case that Smith ever requested postponement of delivery. On the con-

trary, he, uniformly, from beginning to end, insisted that his delivery was dependent upon the delivery to him by the railroad company.

The rule, and one founded in justice, is, in such cases, that where the time for performing a contract of sale has been postposted at the *request* of either party, and the contract is ultimately broken, this has the effect of deferring the period at which the breach takes place, and, therefore, alters the date with reference to which the damages are to be ascertained. *Ogle* v. *Vane*, 2 Q. B. 275; Llansamlet Tin Plate Co. L. R. 16 E. Cas. 155. But however just this rule, the principle has no application to this case, there being no evidence that Smith ever requested postponement of the time for delivery.

The second and third instructions given by the court below, hinge and depend upon the first instruction given, and for reasons already stated, it was error in said court to give either of them in the form in which they were given.

For these reasons the judgment of said circuit court must be reversed with costs to the plaintiff in error; the cause remanded to said circuit court for a new trial to be had therein in conformity with the views herein expressed, with directions that if, upon such new trial, the evidence shall be substantially the same as upon the former trial, and the defendant, the plaintiff in error here, shall again ask for said first and second instructions, that were refused at the former trial, the same shall be given.

The order is as follows:

The court is of opinion, for reasons stated in writing and filed with the record, that the said judgment is erroneous. Therefore, it is considered that the same be reversed and annulled, and that the plaintiff in error recover against the defendant in error his costs by him expended in the prosecution of his writ of *supersedeas* aforesaid here.

And it is ordered that the verdict of the jury be set aside and the cause remanded to the said circuit court for a new trial to be had therein, on which new trial, if the plaintiff in error, the defendant below, shall ask for the said first and second instructions refused at the former trial, and the evidence shall be substantially the same as at the former trial, the said circuit court shall give the said first and second instructions.

All of which is ordered to be certified, &c.

JUDGMENT REVERSED.