STEPHEN M. WELD & CO. v. VICTORY MFG. CO.

(District Court, E. D. North Carolina. May 5, 1913.)

No. 176.

1. CONTRACTS (§ 26*)—ACCEPTANCE OF OFFER—COMMUNICATION OF ACCEPTANCE BEFORE RECEIPT OF WITHDRAWAL.

Defendant, a cotton mill company, wrote plaintiffs, who were dealers in cotton, making an offer, which was below the then market price, for 300 bales of cotton for future delivery, stating: "You can accept this as an open order subject to withdrawal before execution." The price having declined, plaintiffs wired defendant accepting the offer. Twenty-five minutes later they received a message from defendant canceling the order, which was filed before their own message. *Held*, that a completed contract of sale was made when they filed their message of acceptance for transmission, not having received any notice of withdrawal prior to that time.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 119, 120; Dec. Dig. § 26.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. SALES (§ 384*)—BREACH OF CONTRACT—PURCHASE OF COTTON FOR FUTURE DELIVERY.

Defendant's offer having been for cotton of specified grade, at a specified price, to be delivered at a fixed time at defendant's mills, and the acceptance unqualified, defendant on its breach of the contract could not be held liable in damages for a loss sustained by plaintiffs on cotton bought by them on the Exchange for the purpose of "hedging" of different grade and for delivery in New York at a different time; such purchase not being known to defendant, and the damages sustained through it therefore not within the contemplation of the parties either when the contract was made or when it was broken.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1098–1107; Dec. Dig. § 384.*]

3. CONTRACTS (§ 324*)—BREACH—RENUNCIATION—RIGHTS OF OTHER PARTY.

Defendant having notified plaintiff on the day the contract was made that it would not accept and pay for the cotton, plaintiffs had the right to treat such renunciation as a breach, and sue at once for damages, which would be the value of the contract at that time, or at their election they could await the time of performance and tender delivery, in which case the contract would remain in force for the benefit of both parties until broken by the refusal of defendant to accept the cotton, and the damages recoverable would be the value of the contract at that time.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1549–1557; Dec. Dig. § 324.*]

4. SALES (§ 384*)—BREACH OF CONTRACT—PURCHASE OF COTTON—DAMAGES.

Plaintiffs elected to continue the contract in force, and on the date when the first 50 bales were deliverable tendered the same, and on defendant's refusal to receive it treated the contract as then broken, sold the 50 bales and another 50 bales, which they had purchased for the second delivery at a loss, and brought suit for breach of the entire contract. Held, that the action was maintainable, and that the measure of damages as to the cotton tendered was the difference between the price at which it was sold and the contract price, with expenses incidental to defendant's refusal to accept it; that as to the cotton not tendered the measure of damages was the difference between the contract price and the market price and cost of delivery at the time the contract was broken, there being no evidence as to the market price at the time the several future deliveries were required.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1098–1107; Dec. Dig. § 384.*]

At Law. Action by Stephen M. Weld & Co. against the Victory Manufacturing Company. Verdict directed for plaintiffs.

John R. Abney, of New York City, and Johnson & Johnson, of Warsaw, N. C., for plaintiffs.

Rose & Rose, of Fayetteville, N. C., and Davis & Davis, of Wilmington, N. C., for defendant.

CONNOR, District Judge. From the oral evidence, depositions, telegrams, exhibits, and other written evidence it appears, without contradiction, that the plaintiffs, trading under the style and firm name of Stephen M. Weld & Co., were on and prior to the 1st day of September, 1911, engaged in the city of Philadelphia in the business of buying and selling cotton upon orders from cotton mills and others

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

for future delivery. Irvin King was the manager of their office in Philadelphia. W. A. Stedman was in the New York office. The defendant was prior to September 1, 1907, and is now, a North Carolina corporation, operating a cotton mill at Fayetteville, N. C. Dr. H. W. Lilly was on said date and is now president of said corporation. On September 7, 1911, defendant, through its president, wrote and deposited in the post office at Fayetteville, N. C., a letter addressed to plaintiffs at Philadelphia, in the following words:

"Your telegram has been received. We would like a little cotton for October, November and December, but think prices will go lower. If the market should recede, you can buy 300 bales October, November and December at 11½ cents. You can accept this as an open order subject to withdrawal before execution. We should want 100 bales per month in two shipments, 50 bales each, strict mid. Ala. or Miss. cotton 1⅛ staple."

On September 9, 1911, plaintiffs sent to defendant a letter as follows, to wit:

"We have your favor of the 7th and thank you very much for your firm offer of 11½ cents for 300 Strict Middling, $1\,1/_{16}$" Ala. or Miss. cotton, shipment 50 bales each, during the first and second half of each month, Oct.,·Nov., Dec. We shall do our very best to accept this offer, but you can see this is quite out of line, based on the advance yesterday. We note, however, your offer is good until canceled, and on any temporary decline in the market we shall do our very best to put the business through. From present indications we are going to have some very fine $1\,1/_{16}$" N. Georgia cotton and we should like to know if you have any objection to our shipping you such cotton, which we feel quite sure will fully answer your requirements. From our information it looks like Mississippi will be high this year compared to other States on account of a great deal of deterioration having taken place and the writer is inclined to think Alabama and Georgia will make the biggest crops they ever before made."

On September 11, 1911, defendant sent to plaintiff the following letter:

"Replying to your favor 9th inst. the North Georgia cotton has never given us satisfaction. We would be interested only in Miss. or Ala. cotton."

On September 20, 1911, at 10:15 a. m., plaintiffs deposited in the office of the Western Union Telegraph Company at Philadelphia for transmission to defendants a telegram in the following words:

"We accept your offer Eleven one half three hundred mentioned."

This telegram was delivered to defendant at Fayetteville, N. C., at 12:35 p. m.

On September 20, 1911, at 9:55 a. m., defendant deposited in office of the Western Union Telegraph Company at Fayetteville, N. C., a telegram addressed to plaintiffs in the following words:

"Please cancel order three hundred bales, if not bought, advise at once."

This telegram was delivered to plaintiffs at their Philadelphia office at 10:40 a. m. Plaintiffs at 10:44 a. m. deposited in the telegraph office at Philadelphia a telegram addressed to defendant at Fayetteville, N. C., in the following words:

"Wired you accepting at ten fifteen. Your message received ten forty, too late having already bought."

At 12:08 p. m. plaintiffs received from defendant telegram saying:

"Your ten fifteen message was never received—we did not hear from our cancelling telegram and bought elsewhere."

At 12:20 p. m. plaintiffs wired defendant:

"Your second wire received twelve eight. We cannot cancel, you made firm offer unless cancelled. We accordingly bought on opening to-day wiring acceptance Western Union ten fifteen, and immediately wired on receipt yours ten forty stating too late."

On same day plaintiffs wrote to defendant:

"We attach sales sheet covering 300 B/c sold you today and regret exceedingly that there should have been any misunderstanding between us regarding the matter. We think when you fully investigate you will find we are absolutely correct. You made us firm offer in your letter to us of Sept. 7th, from which we quote as follows: [Quoting the several telegrams.] Enclosed was a statement in the following words:

" 'We confirm sale made to you today for account of ourselves as follows: 300 bales cotton at 11½¢ per pound landed Fayetteville, N. C. Grade Even Running Str. Middling 1 1/16" staple. Shipment Oct., Nov., Dec. 100 bales monthly in two shipments 50 bales each from our option, Alabama or Mississippi cotton—to Fayetteville, N. C. Loss in weight not to exceed three pounds per bale from Invoice weight. Sight draft with Bill Lading attached.' Thanking you for this order and requesting you to acknowledge receipt of this letter, we remain, etc."

On September 22d plaintiffs received from defendant two letters as follows:

"We confirm our wire of this morning, viz: 'Please cancel order 300 bales if not bought. Advise at once.' We expected you would sell us the cotton yesterday as we have had two offers at the price. * * * At 9:55 this morning we filed telegram to you as follows: 'Please cancel order 300 bales if not bought. Advise at once.' We waited until 11 o'clock and getting no response, bought from another party, assuming order to be cancelled. At 11:20 we received from you wire as follows: 'Wired you accepting at ten fifteen. Your message at ten forty too late.' In reply we wired: 'Your ten fifteen message was never received. We did not hear from our cancelling telegram and bought elsewhere.' Neither telegraph company has any record of receiving but one telegram from you today i. e., the one referred to as having been delivered to us at 11:20. You can very readily then see what our position' is and the whole matter is up to the Telegraph Company with whom you filed 10:15 message. * * * 12:55 p. m. Since above was written your 10:15 telegram was received at 12:35 p. m. We are this moment in receipt of your wire declining to cancel the order. We wired you to cancel at 9:55 a. m. In the ordinary course of business we should have been promptly advised as to the status of the order, whereas we did not receive your acceptance telegram until 12:35 p. m., after we had bought our cotton. We shall, therefore, decline to receive your cotton if shipped."

At 10:44 a. m. of same day, September 22d, plaintiffs wired defendant:

"Your letter twentieth received. Telegraph whether this is final—if so, will be compelled to dispose of cotton bought against sale charging you with loss incurred."

On same day, September 22d, plaintiffs wrote defendant:

"Your letter of the 20th received this morning and we note all you write with interest. We cannot understand why you should assume the position you do in this matter when you consider all the facts. * * * We wired you to-day as follows, thinking it better to give you our final decision in the

matter. * * * We hope to hear from you further in reference to this matter and feel quite confident, when you consider all the facts in the case and investigate our statement made you as to wire service, you will agree with us that our position is correct."

·On September 26, 1911, plaintiffs received from defendant the following letter:

"Replying to your favors, we still maintain that our position is right. Our own opinion, and that of our mill friends, who have had long experience, agree that it was not fair to us, on a declining market, to be held up when we had wired you before market had opened to advise at once. It appears from your statement that the telegraph company was at fault. We are not."

On September 26, 1911, plaintiffs wrote defendant a letter, insisting that they were correct in the position which they had taken, saying, among other things:

"As before stated, the cotton was bought on the opening of the market, whereas your wire which you state was sent at 9:55 did not reach us until 10:40. * * * Had your wire reached us before we bought the cotton, your position would have been absolutely correct, but as it did not, we cannot see that you have any grounds whatever for refusing to take the cotton and while we very much dislike to insist on your taking the cotton, we will have to do so unless you wish to reimburse us for any loss sustained in disposing of the cotton elsewhere which, of course, would be considerable now, as the market has declined some 75 or 80 points since our purchase."

Defendant on September 28th acknowledged the receipt of this letter, saying:

"You fail to state and apparently overlook the fact that your telegram of 10:15 a. m. did not reach us until 12:35 o'clock. In the meantime, we were held up in a declining market which was liable to react, and it was our right to take advantage of the lower prices in the absence of immediate advice from you. You appear to have advised the Telegraph Company, but not us."

On September 29th plaintiffs wrote defendant:

"We have not overlooked the fact that our first telegram to you, which was sent at 10:15 a. m., did not reach you until 12:35, but our second telegram, which was sent at 10:40 a. m. did reach you at 11:20 a. m. and this, in itself, would act as a confirmation as we advised you therein that we had already bought the cotton and could not cancel. * * * The whole controversy, in our mind, rests on the fact of whether we bought the cotton before the receipt of your message, cancelling our firm offer. As we have previously advised you, this was the case and we have given you all the open facts so that you might investigate them and see for yourself that we gave you the facts. There remains, therefore, nothing for us to do but to ship you the cotton as sold, and we have made arrangements to ship you the first cotton, 50 bales, from Alabama between the first and fifteenth of October, and we trust the cotton will give you entire satisfaction."

This letter closed the correspondence in so far as it affects the question as to whether a contract was concluded between the parties for the sale by plaintiffs to defendant of the cotton in accordance with the terms of the letter of September 7, 1911.

It is in evidence, without contradiction, that plaintiffs had a manager of their business in New York; that their Philadelphia office was connected with the New York Cotton Exchange by a wire of the Western Union Telegraph Company and a "ticker."

The Cotton Exchange opened at 10 o'clock a. m. and closed at 3

p. m., except Saturday, when it closed at 12 m. On September 19th Mr. King, plaintiffs' Philadelphia manager, was in New York, and gave the New York manager an order to buy "300 January at 11 cents or lower" on the Exchange. On the opening of the market September 20th, cotton declined, and the New York manager for plaintiffs bought 300 bales for delivery at 10:97 and at 10:13 advised the Philadelphia office. This office knew, upon the opening of the market, from the price registered on the "ticker" that cotton had opened below 11 cents, and that the order would be executed by the New York manager. He sent the telegram to defendant at 10:15. The January cotton was bought in New York for account of plaintiffs. Mr. King says that:

"There is a relation between the movement of prices of cotton on the Cotton Exchange and the movement of prices of cotton in the fields or from the fields in the South."

On September 20, 1911, plaintiffs wrote J. H. Arnold & Co., Birmingham, Ala.:

"We are interested in buying 300 bales E. R. Str. Mid. 1.16½ staple, Ala. or Miss. Cotton at 35 points on Jan. landed at Fayetteville, N. C. without commission. Shipment 50 bales each during first and second half each month. Oct. Nov. Dec. Whenever you can offer the cotton at this figure we would suggest your wiring us."

On September 28th Arnold & Co. wired plaintiffs:

"Sell Fayetteville 100, 10⅝ as per your letter Sept. 26th."

This offer was accepted by plaintiffs, and on the same day they sold "100 January" on the Exchange at 10:22—a loss of $325 and brokerage of $14.

On October 3, 1911, Arnold shipped from Birmingham to Fayetteville, N. C., 50 bales cotton to order N. H. Burt—"Notify Victory Manfg. Co." Plaintiffs on October 5th drew sight draft on defendant for $2,805, being price of 50 bales of cotton at 11:50, notifying defendant. On October 6th defendant wrote plaintiffs that it would decline to receive the cotton or pay draft. It was duly presented October 10 and protested October 16, 1911. The cotton was shipped to Fayetteville, and upon refusal of defendant to receive it resold at a loss of $335.39. On October 11th, the day upon which plaintiffs received notice that defendant had refused to pay the draft and receive the 50 bales of cotton, they wired their New York manager to sell the "200 January." This was done at a loss of $1,530. On the same day plaintiffs telegraphed Arnold, at Birmingham, to sell the remaining 50 bales of the 100 bales purchased of them. This was done at a loss of $237.-50. Plaintiffs did not purchase the remaining 200 bales of cotton in Birmingham, but elected to treat the contract as broken by defendant on October 10, 1911.

[1] The letter of defendant to plaintiffs of September 7, 1911, was a "firm offer * * * subject to withdrawal before execution." When the plaintiffs on September 20th filed with the Telegraph Company at 10:15 a. m. the telegram accepting the offer, the contract was complete. There was a proposal on the one part, and an acceptance on the other. The withdrawal of the offer or proposal was not com-

pleted by filing with the Telegraph Company the message at 9:55 a. m.—it was only effectual for that purpose, when received by plaintiffs at 10:40 a. m. The contract is complete "when the answer containing the acceptance of a distinct proposition is dispatched by mail or other usual mode of communication * * * and before any intimation is received that the order is withdrawn. Putting a letter in the mail containing the acceptance, and thus placing it beyond the control of the party, is valid as a constructive notice of the acceptance." 2 Kent, Com. 477; Patrick v. Bowman, 149 U. S. 411, 13 Sup. Ct. 811, 866, 37 L. Ed. 790; Burton v. U. S., 202 U. S. 344, 26 Sup. Ct. 688, 50 L. Ed. 1057, 6 Ann. Cas. 379, and notes; Pollock, Cont. (Wald.) 135.

The jury are instructed to answer the first issue: "Did the plaintiffs accept the defendant's offer to purchase 300 bales of cotton, as alleged in the complaint, before the defendant's telegram withdrawing said offer was received by plaintiffs?" "Yes."

The second issue, "If so, did defendant breach the contract made with plaintiffs?" upon the uncontradicted evidence will be answered, "Yes."

The question remaining for solution is presented by the third issue: "What damages, if any, are the plaintiffs entitled to recover of the defendant?"

For the purpose of performing the contract on their part, plaintiffs were entitled to buy in the market 300 bales of cotton of the grade, quality, etc., described in the defendant's letter of September 7, 1911, and tender it to defendant in Fayetteville, N. C., in lots of 50 bales on the dates named in the contract and demand payment of the contract price by drawing draft with bill of lading attached. As the title to the cotton did not pass by virtue of the tender, plaintiffs were not entitled to treat it as the property of the defendant and sue for the price. It became their duty, upon refusal of defendant to accept the cotton, to sell it at the best market price.

Defendant, however, insists that plaintiffs having been notified at 10:40 a. m. on September 20, 1911, that it had canceled the order, or withdrawn the proposition, the damages, if any, were only nominal. Plaintiffs, on the contrary, insist that, in accordance with the custom obtaining in the trade, they went upon the Cotton Exchange, before accepting the proposal to deliver the cotton, and protected themselves against loss by buying 300 bales of cotton at the then price to be delivered in January, 1912, and that they were entitled, notwithstanding defendant's notice to them, that it would not receive the cotton, to buy the spot cotton on the market in Alabama and Mississippi of the grade, etc., named in the contract and tender it to defendant, on the days named, and for refusal on the part of defendant to receive and pay for it to sell the cotton at the market price and recover the difference between such price and the contract price as damages; that for any loss sustained by reason of the decline in price of the cotton bought on the Exchange for January delivery, as well as loss sustained in decline in price of the cotton actually bought, they are entitled to recover of the defendant; further, that they were entitled upon the refusal of

defendant to receive the first 50 bales tendered October 10, 1911, to treat the entire contract as breached at that time, and, without buying the balance of the cotton, recover the difference in the contract price and the price of cotton on that day. To illustrate, and make clear, plaintiffs' contention, their counsel thus states the damage which he insists they are entitled to recover.

[2] That plaintiffs, for the purpose of "hedging," bought on the Cotton Exchange, pursuant to and in compliance with the rules, etc., of the Exchange, on September 20, 1911, 300 bales of cotton for January delivery, upon which they lost, by reason of the decline in price, $1,855. That they bought at Birmingham on September 28th 50 bales which they tendered to defendant, and upon its refusal to accept sold at the market price at a loss of $335.39, which, with demurrage, protest fees, and telegrams, amounted to $351.89. That they also bought at Birmingham 50 bales which they did not tender, but sold at a loss of $237.50. They also claim that if the contract had been performed on the part of the defendant they would have made profits which, added to the amount actually lost, would aggregate $2,736.89, for which they demand judgment.

This contention renders it necessary to inquire what relation the purchase by the plaintiffs of the 300 bales for January delivery on the Cotton Exchange bore to the contract for the sale and delivery of the 300 bales of spot cotton to defendant, and to what extent, if any, defendant is affected by this purchase and its results.

It is not necessary to inquire to what extent, if any, under the testimony and the charter, by-laws, and rules of the Cotton Exchange this transaction should be considered as a purchase by plaintiffs of "cotton," as distinguished from a dealing in "futures." It will be assumed that it was a purchase of cotton—that is, that before the acceptance of defendant's offer of September 7, 1911, and in view of accepting it, plaintiffs' New York manager at 10:13 a. m. bought to be delivered to plaintiffs in New York, according to the rules of the Cotton Exchange, January, 1912, 300 bales of cotton. Upon this contract the seller has the privilege of including as many grades as he has in the lots.

There is a difference in price between the different grades; and for such grades as are below "middling," which are "strict low middling," "low middling," "strict good ordinary," and "good ordinary," the proper difference of prices are deducted. There is no evidence that defendant at any time knew, or was informed, that plaintiffs had purchased this cotton for the purpose of "hedging." It is insisted, however, that this purchase was made in accordance with the custom prevailing among persons engaged in the business of buying cotton for mills for future delivery, and that defendant knew of such custom.

Attention is called to the fact that defendant had theretofore bought cotton for its mill from plaintiffs to be delivered in the future. Mr. King describes the method of conducting their business with much detail. Without giving his exact language, it would seem to result in this: Upon the acceptance of an order such as defendant's to sell and deliver at a fixed price spot cotton at some fixed day or days in the

future to be gathered in Southern markets, the seller buys on the New York Cotton Exchange cotton for future delivery, at a price which enables him to fix his profit, without regard to the change in price of cotton between the date of the contract and the date of its performance. This is termed, in the language of the trade, "hedging," and is defined as:

"A means by which collectors and exporters of grain or other products, and manufacturers who make contracts in advance for the sale of their goods, secure themselves against the fluctuations of the market by counter contracts for the purchase or sale, as the case may be, of an equal quantity of the product, or of the material of manufacture." Board of Trade v. Christie, etc., 198 U. S. 249, 25 Sup. Ct. 639, 49 L. Ed. 1031.

There is no question here as to the propriety of the course pursued by plaintiffs, so far as they were concerned. It was doubtless prudent on their part. It would seem that its purpose was to fix their profit at the difference between 11.50 and 10.97 cents. It is not clear, however, that the purchase by plaintiffs of the January cotton in New York has any legal relation to the defendant's liability for the breach of an entirely different contract. It is elementary that the acceptance of a proposal must be in strict accordance with the terms of the proposal—otherwise there is no contract—no meeting of minds. "The party who made the offer has a right to say, 'Non hæc in fæderi veni,' and to decline any other bargain than that which he offered. When an offer is accepted in the terms in which it was made, the contract is binding upon both parties." Smith on Cont. 159 (160); Pollock, Contr. 38.

Plaintiffs say, however, that certain terms were used by defendant which they, plaintiffs, construed to refer to the purchase by them of cotton on the Exchange. This may all be true, and yet fall far short of showing that defendant had any knowledge or was informed that plaintiffs before accepting its offer of September 7th had bought on the New York Cotton Exchange 300 bales of January cotton at 10.97 against the contract to sell and deliver to it 300 bales at a different time of a different grade, etc. Giving to the evidence, in regard to the custom of the trade, full force, it does not sustain plaintiff's contention that, not only was the custom on the part of the vendor in making such contracts to "hedge" known to defendant, but that it authorized them to go on the market and buy for future delivery at a different time cotton which did not correspond in grade, quality, place of growth, or otherwise, with the cotton described in the proposal and in the unqualified acceptance. It may be that, if known to defendant, the purchase on the exchange of the January cotton may have been accepted by it as a method of fixing the measure of its liability for a breach of the contract before the purchase and tender of the spot cotton; it would thus have been brought within the contemplation of the parties to the contract. Any suggestion of this kind is repelled by the terms of the letter or memorandum sent by plaintiffs to defendant on May 20th, confirming "the sale made to you for account of ourselves." There is no ambiguity about the contract calling for or justifying construction or seeking explanation by evidence aliunde. It

was a simple contract by which plaintiffs sold to defendant 300 bales of cotton of specified grade, quality, place of growth, at a specified price, to be delivered at a fixed time and place. It would do violence to elementary principles to "read into it" any other or different terms as to the subject-matter, or measure of liability for its breach than those fixed by the parties and the law.

Plaintiffs' Exhibit No. 10, dated September 20, 1911, sets out the contract which was made by the letter of the 7th and the wire of 10:15 a. m. of September 20th. Cotton purchased by defendant is to be "landed at Fayetteville, N. C.—is to run Strict Good Middling—to be delivered Oct. Nov. Dec., 100 bales monthly in two shipments, 50 bales each—our option Alabama or Mississippi Cotton—price 11½ cents." There is no reference to any contract made by plaintiffs for the purchase of 300 bales for January delivery of the cotton, etc. It is said that there is a relation between the price of cotton on the New York Cotton Exchange and in the Southern markets—this is undoubtedly true—but the question arises, What relation, how is the price of 50,000 pounds of cotton, of the grades, etc., fixed by the Exchange to be delivered in New York in January 1912, related to the price of the same quantity of cotton of an entirely different grade, to be grown in Alabama or Mississippi and delivered in Fayetteville, N. C., at six different dates? As to this there is no evidence. How could defendant know that plaintiffs had "hedged" on their contract by buying 300 bales of cotton on the Cotton Exchange in New York for January delivery at 10.97?

It is true the plaintiffs in their letter of September 20th say:

"Had we received your message cancelling the order before the cotton had been bought in New York, we would have complied with your wishes."

On the 22d they wired defendant:

"Telegraph whether this is final, if so, we will be compelled to dispose of cotton bought against sale, charging you with the loss incurred."

On September 26th plaintiffs write:

"As before stated, the cotton was bought on the opening of the market. * * * Had your wire reached us before we bought the cotton, your position would have been absolutely correct," etc.

But in none of these telegrams or letters is any reference made to the purchase of 300 bales of cotton for January delivery. If plaintiffs had purchased cotton for October, November, and December deliveries, it may be that a different question would be presented. It will be noted that plaintiffs did not buy any cotton for account of defendant—there is no relation of principal and agent or broker and factor. The January cotton was bought by Weld & Co. for account of Weld & Co. The purchase was therefore made by themselves for their own benefit.

In the leading case of Hadley v. Baxendale, 9 Exch. 345, uniformly cited with approval, it is said:

"When two parties make a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach should be such as may fairly and reasonably be considered either arising naturally;

i. e., according to the usual course of things from such breach of contract itself, or such as may be reasonably supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it. If the special circumstances, under which the contract was actually made, were communicated by the plaintiffs to the defendant, and thus known to both parties, the damages resulting from the breach of such a contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated. But, on the other hand, if these special circumstances were wholly unknown to the party breaking the contract, he, at the most, could only be supposed to have had in his contemplation the amount which would arise generally and in the great multitude of cases, not affected by any special circumstances, from such a breach of contract."

In Masterton v. Mayor, 7 Hill (N. Y.) 61, 42 Am. Dec. 38, Nelson, C. J., quotes with approval the following language from Pothier:

" 'In general the parties are deemed to have contemplated only the damages and interest which the creditor might suffer from the nonperformance of the obligation, in respect to the particular thing which is the object of it, and not such as have been incidentally occasioned thereby in respect to his other affairs.' " 1 Evans, Pot. 91.

This rule for the admeasurement of damages for breach of contract has been approved by the Supreme Court of the United States. Primrose v. W. U. Tel. Co., 154 U. S. 31, 14 Sup. Ct. 1098, 38 L. Ed. 883. For the breach of the contract on the part of defendant, therefore, plaintiffs are entitled to recover such damage as usually and ordinarily flowed from such breach, together with such special damage as proximately flowed from such special circumstances as were known to defendant at the time the contract was entered into and was in contemplation of the parties at that time. Does the loss sustained by plaintiffs, by reason of the purchase by them, for their own protection, of the 300 bales of cotton on the Exchange to be delivered in January, 1912, come within this rule? Conceding that defendant knew plaintiffs would "hedge" by making the purchase on the Exchange, it by no means follows that they knew that they would buy January cotton at 10.97, or that, if they had known it, the law will, from that fact alone, attribute to them a purpose to make good such loss as plaintiffs should sustain by the manner in which they had dealt with such contracts. Plaintiffs had purchased the January cotton when they accepted defendant's proposal, but they did not then, or at any other time, communicate that fact to defendant—hence, it is impossible that for a refusal on the part of defendant to receive the cotton in October, November, and December as contracted for it could have contemplated a liability for plaintiffs' purchase of January cotton. The measure of liability is clearly stated in Hobbes v. London, etc., R. Co., L. R. 10 Q. B. 111. The recovery for breach of contract is "such damages as a man, when making the contract, would contemplate would flow from a breach of it." 8 Am. & Eng. Enc. 585. Defendant is not liable for the loss sustained by plaintiffs by reason of the purchase by them of the January cotton and the sale thereof at a price below the price paid for it.

If the contention of plaintiffs that defendant was fixed with knowledge that they had bought the January cotton, and therefore such pur-

chase was in contemplation of the parties, etc., it would seem that upon the receipt of the telegram from defendant at 10:40 a. m. or at 12:08 a. m. on September 7th, or certainly upon receipt of the letters of September 20th on September 22d, it was their duty to at once sell this cotton on the Exchange and prevent further loss. It is manifest the parties were selling and buying actual cotton for future delivery, and not dealing in margins, or "futures."

[3] Eliminating the "hedging" contract made by plaintiffs by the purchase of the "January cotton," we proceed to ascertain what damages they are entitled to recover by reason of the breach of the contract by defendant. The obligation assumed by the plaintiffs was to purchase in the market, because it was well understood that at the time of making the contract they did not own the cotton, and were not cultivating cotton, 300 bales of cotton of the quality, etc., prescribed, and on the several days named in the proposal to deliver it to defendant at Fayetteville, N. C.; they were entitled, upon complying with this obligation, to demand that defendant accept the cotton and pay for it at the price named in the contract. The obligation assumed by the defendant was to accept the cotton when tendered, and pay the stipulated price in the manner prescribed in its proposal of September 7, 1911. Neither party could without the consent of the other rescind it, or change its terms. Defendant, however, very soon after making the contract notified plaintiffs that it did not intend to accept or pay for the cotton—this it did repeatedly. Plaintiffs, on the other hand, notified defendant of their purpose to perform and to demand performance on the part of defendant. The reason for this course of conduct on the part of both is manifest—the price of cotton was declining. What effect did this conduct have upon the contractual rights and liabilities of the parties?

"The promisee (in this case the plaintiffs) may, if he pleases, treat the notice of intention (not to perform) as inoperative and await the time when the contract is to be executed, and then hold the other party responsible for all the consequences of nonperformance; but, in that case, he keeps the contract alive for the benefit of the other party as well as his own; he remains subject to all of his own obligations under it, and enables the other party not only to complete the contract, if so advised, notwithstanding his previous renunciation of it, but also to take advantage of any supervening circumstance which would justify him in declining to complete it. On the other hand, the promisee may, if he thinks proper, treat the repudiation of the other party as a wrongful putting an end to the contract, and may at once bring his action as on a breach of it; and in such action he will be entitled to such damage as would have arisen from the nonperformance of the contract at the appointed time, subject, however, to abatement in respect of any circumstances which may have afforded him the means of mitigating his loss." Roehm v. Horst, 178 U. S. 1, 11, 20 Sup. Ct. 784, 44 L. Ed. 953. It is further said:

"It would seem on principle that the declaration of such intention [not to perform the contract when the time for performance arrives] by the promisor is not in itself and unless acted on by the promisee a breach of the contract;

and that it only becomes a breach when it is converted by force of what follows it into a wrongful renunciation of the contract. Its real operation appears to be to give the promisee the right of electing either to treat the declaration as brutem fulmen, and holding fast to the contract, to wait till the time for its performance has arrived, or to act upon it, and treat it as a final assertion, by the promisor, that he is no longer bound by the contract, and a wrongful renunciation of the contractual relation into which he has entered. But such declaration only becomes a wrongful act if the promisee elects to treat it as such." Johnson v. Milling, 16 Q. B. Div. 472.

In the same case Lord Esher says:

"When one party assumes to renounce a contract—that is, by anticipation refuses to perform it—he thereby, so far as he is concerned, declares his intention then and there to rescind the contract. Such a renunciation does not, of course, amount to a recission of the contract, because one party to a contract cannot, by himself, rescind it, but, by wrongfully making such a renunciation of the contract, he entitles the other party, if he pleases, to agree to the contract being put an end to, subject to the retention by him of his right to bring an action in respect of such wrongful rescission."

The conclusion to which these authorities bring us is that the plaintiffs may have treated the contract as breached by defendant immediately upon being notified of its intention not to accept the cotton and to have sued at once, in which event the measure of damages would have been the value of the contract at the time of the breach. Masterton v. Mayor, 7 Hill (N. Y.) 61, 42 Am. Dec. 38; Wilkinson v. Dunbar, 149 N. C. 20, 62 S. E. 748.

Defendant insists that when plaintiffs were notified that it would not accept the cotton that it was their duty to make reasonable exertions to render the injury as small as possible; that they cannot recover for any loss which they could have avoided with ordinary care and reasonable expenses. This principle invoked by defendant is undoubtedly sound; the only question is as to its application to the facts in this case. The argument of the defendant assumes that by notifying plaintiffs that it would not accept the cotton the contract was at once, and thereby, broken, and that the duty to use reasonable effort to mitigate the damage by use of ordinary care was at once imposed upon the plaintiffs. The error which lurks in this assumption has been pointed out in the authorities noted. The distinction, overlooked by defendant's counsel, is this: By notifying plaintiffs that defendant intended to break or breach the contract, when the time for the performance arrived, did not operate to produce a breach. Plaintiffs were entitled to treat this declaration as a breach; and, if they had done so, the duty of mitigating damages by the exercise of reasonable effort would at once have arisen. Plaintiffs had not at that time purchased any cotton or entered into any contract to do so. The measure of damages, at that time, would have been the value of the contract. It is not necessary to consider what elements entered into the damage then recoverable because plaintiffs exercised their right of election to refuse to take defendant's declaration of an intended breach as a present breach—they stood by the contract. In the case cited by defendant's counsel, where the duty of mitigation was imposed, there was a present breach of the contract. Lawrence v. Porter, 63 Fed. 62, 11

C. C. A. 27, 26 L. R. A. 167. This question will become of interest in this case later on.

[4] Plaintiffs having elected to maintain the integrity of the contract, and having so notified the defendant, proceeded to make a subcontract with Arnold & Co. of Birmingham, Ala., for the purchase of cotton to enable them to comply with the contract on their part in respect to the first delivery. They bought 50 bales of cotton (24,392 pounds), which was shipped to Fayetteville, N. C., at a cost to the plaintiffs of $2,591.65. The value of the cotton at the contract price was $2,805.05. For this amount they drew a draft upon defendant, attaching it to the bill of lading and sending it for collection to the Bank of Fayetteville, which was duly presented. Defendant refused to pay the draft, or accept the cotton, assigning no other reason than that it was under no obligation to do so. Plaintiffs sold the cotton at the best market price attainable, sustaining an actual loss of $335.39. They also paid for demurrage $14, protest fee $1.50, and telegram $1, aggregating $351.89.

Mr. Benjamin says:

"The date at which the contract is considered to have been broken is that at which the goods were to have been delivered, and not that at which the buyer may give notice that he intends to break the contract, and to refuse to accept the goods." Sales (Ed. 1888) § 1012.

In Boorman v. Nash, 9th B. & C. 145, plaintiff, in November, 1825, sold goods to defendant deliverable in the months of February and March following. Defendant became bankrupt in January. The goods were tendered and not accepted at the dates fixed by the contract, and sold at a loss. The loss would have been less if the goods had been sold in January, when the buyer became bankrupt. It was held that the contract was not broken by the bankruptcy; that the assignee was entitled to adopt it; that the vendor was not bound to sell before the time of delivery; and that the true measure of damages was to be calculated according to the market price at the date fixed by the contract for performance. In U. S. v. Behan, 110 U. S. 338, 4 Sup. Ct. 81; 28 L. Ed. 168, it was held that, when a party to a contract is prevented by the wrongful act of the other party from performing, he is entitled to recover, as damages, whatever sum he has expended towards performance, together with the profits he would have realized by performance. Clements v. State, 77 N. C. 142; Oldham v. Kerchner, 79 N. C. 106, 28 Am. Rep. 302. Nelson, C. J., in Masterton v. Mayor, supra, says:

"Profits which are the direct and immediate fruits of the contract entered into between the parties stand upon a different footing (from uncertain and speculative profits). These are part and parcel of the contract itself, entering into and constituting a portion of its very elements; something stipulated for, the right to the enjoyment of which is just as clear and plain as to the fulfillment of any other stipulation. They are presumed to have been taken into consideration and deliberated upon before the contract was made, and formed, perhaps, the only inducement to the arrangement. The parties may, indeed, have entertained different opinions concerning the advantage of the bargain, each supposing and believing that he had the best of it; but this is a mere matter of judgment going to the formation of the contract for which each has shown himself willing to take the responsibility, and must therefore

abide the hazard. Such being the relative position of the contracting parties, it is difficult to comprehend why in case one party has deprived the other of the gains or profits of the contract by refusing to perform it this loss should not constitute a proper item in estimating the damages. * * * The party who is ready to perform is entitled to a full indemnity for the loss of his contract. He should not be made to suffer by the delinquency of the other party, but ought to recover precisely what he would have made by performance. This is as sound in morals as it is in law."

This is uniformly held as sound law.

Applying these principles to the admitted facts in this case, it is manifest that plaintiffs are entitled to recover such profit as was certain, definite, or reasonably capable of being ascertained. Defendant corporation was engaged in operating a mill for the manufacture of cotton goods. It was essential to its successful operation that it should have an adequate supply of cotton of a certain grade, fiber, and grown upon the land in Mississippi or Alabama. To secure this it was necessary to make contracts at fixed prices for future delivery. This it did by making the proposal to and receiving the acceptance of the plaintiffs. They, on the other hand, thinking that the price of cotton would recede and having the experience and facilities enabling them to secure the cotton in the Southern markets, accepted the proposal with the expectation of making the profit represented by the difference between the contract price and that at which they expected to be able to buy and deliver the cotton. This is the basis upon which transactions of this character are daily made. The opinion of the plaintiffs turned out to be correct—they are entitled to the profit which would have accrued to them from this condition if defendant had performed its part of the contract. They contracted with Arnold & Co. to deliver the 50 bales in Fayetteville, N. C., at a cost of $2,591.65, defendant contracted to take and pay for it $2,805.08. The difference ($213.43) represents the profit which plaintiffs would have received if defendant had performed the contract on its part. The plaintiffs are entitled to recover this amount, together with the $351.89, expended in its effort to perform on their part.

The rights and liabilities of the parties in respect to the remaining 250 bales depend upon other and different principles of law. Plaintiffs purchased, September 28, 1911, 50 bales to enable them to meet the second delivery, and on October 10, 1911, when notified that defendant had pursuant to its declared intention refused to take the cotton, elected to treat the contract as broken at that date and sued for damages for what is termed the anticipatory breach. The conditions here were in many respects similar to those found in Horst v. Roehm (C. C.) 84 Fed. 565. There defendant entered into a contract with plaintiffs for the sale of 1,000 bales of hops to be delivered at different dates in monthly installments at a fixed price. A portion of the hops were delivered. Defendant for reasons not necessary to state, and held by the court to be invalid, notified plaintiffs that he regarded the contract as canceled, and would not accept any further deliveries. Plaintiffs tendered the 20 bales due on the October delivery, which defendant refused to accept, insisting that the contract was canceled and that he would not accept that, or any future delivery. Plaintiffs

made no further effort to make delivery under the contract, but sued to recover damages for its breach. It was held, and upon writ of error to the Circuit Court of Appeals in Roehm v. Horst, 91 Fed. 345, 33 C. C. A. 550, and 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953, affirmed, that the plaintiff was entitled to recover. Mr. Chief Justice Fuller thus states the question presented for decision:

"The first contract falls within the rule that a contract may be broken by the renunciation of liability under it in the course of performance and suit may be immediately instituted. But the other three contracts involve the question whether, where the contract is renounced before performance is due, and the renunciation goes to the whole contract, and is absolute and unequivocal, the injured party may treat the breach as complete and bring his action at once. Defendant repudiated all liability for the hops, * * * and notified plaintiff that he should make * * * arrangements to purchase his stock of other parties, whereupon plaintiffs brought suit. The question is therefore presented in respect to the three contracts whether plaintiff was entitled to sue at once or was obliged to wait until the time came for the first month's delivery under each of them. * * * It cannot be denied that an immediate action could have been brought in which damages could have been recovered in advance for the breach of the agreement to deliver during the two remaining years. But, treating the four outstanding contracts as separate contracts, why is it not equally reasonable that an unqualified and positive refusal to perform them constitutes such a breach that damages could be recovered in an immediate action? Why shall plaintiff be required to bring four suits instead of one?"

After an exhaustive review of the authorities, both English and American, the learned Chief Justice reaches the conclusion that the action was well brought, and that plaintiffs were entitled to recover for the anticipatory breach of the contract such damages as they sustained. In regard to the measure of damages recoverable in such cases and the method of ascertainment, the Chief Justice said:

"As to the question of damages, if the action is not premature, the rule is applicable that plaintiff is entitled to compensation based, as far as possible, on the ascertainment of what he would have suffered by the continued breach of the other party down to the time of complete performance, less any abatement by reason of circumstances of which he ought reasonably to have availed himself. If a vendor is to manufacture goods, and during the process of manufacture the contract is repudiated, he is not bound to complete the manufacture and estimate his damages by the difference between the market price and the contract price, but the measure of damages is the difference between the contract price and the cost of performance. Even if in such cases the manufacturer actually obtains his profits before the time fixed for performance and recovers on a basis of cost which might have been increased or diminished by subsequent events, the party who broke the contract before the time for complete performance cannot complain, for he took the risk involved in such anticipation. If the vendor has to buy instead of to manufacture, the same principle prevails, and he may show what was the value of the contract by showing for what price he could have made subcontracts, just as the cost of manufacture in the case of a manufacturer may be shown. * * * In this case plaintiff showed at what prices they could have made said contracts for forward deliveries according to the contracts in suit and the difference between the prices fixed by the contract sued on, and those, was correctly allowed." See Acme Food Co. v. Older, 64 W. Va. 255, 61 S. E. 235, 17 L. R. A. (N. S.) 807.

It would seem that the only reliable evidence in regard to the cost of cotton in Birmingham on October 10th is found in the sale of the 50 bales purchased by plaintiffs on account of the contract and resold

205 F.—50

at 9.67½ cents a pound. The evidence does not show at what price the plaintiffs could have bought cotton on each, or any, of the days upon which the future deliveries were due. Mr. King stated on his oral examination that the amount sued for was a great deal less than the difference between the contract price and that at which he could have gotten cotton to deliver at the times when the five last deliveries were due under the contract. He did not state what the difference was. Plaintiffs insist that the sale of the 50 bales on October 12th should be taken as the price at which they could have bought the cotton for the future deliveries. The burden is on the plaintiffs to show at least with a reasonable degree of certainty what their profits would have been at the date of performance as the basis for estimating the value of the contract at the date of the breach. The cost of the cotton which was tendered delivered in Fayetteville was 10.62½ cents per pound. This was on September 28th. There is no evidence as to the fluctuation between that date and October 10th. On September 29th plaintiffs wrote defendant that they would draw for the 50 bales, to which defendant responded on October 3d:

"We hereby notify you again not to ship the cotton as it will not be received or paid for by us."

On October 4th, in response to this letter, plaintiffs wrote defendant, reiterating their position in regard to the transaction, and saying in conclusion:

"We will not recede from the just position which we have taken and expect to draw on you for the 50 bales we are shipping you, in exact accordance with our contract and, if you elect to let our draft go to protest, we will then at once dispose of this cotton as well as the other two hundred and fifty bales, which will be due you, to the best advantage and will then enter suit against you for whatever loss is incurred for the entire three hundred bales."

On October 5th, plaintiffs wired defendant that they were drawing for the price of the cotton. This wire was confirmed by letter of same date inclosing invoice for the 50 bales. On October 6th defendant wrote plaintiffs that it would decline to pay the draft. This closed the correspondence. The cotton was tendered October 10th—defendant refused to accept, and on that day plaintiffs elected to treat the contract as breached. The measure of damages, as we have seen, is the value of the contract on that day, and this is ascertained by fixing the cost of performance on the part of the plaintiffs.

In Masterton v. Mayor, supra, Beardsley, J., said:

"No rule which will be absolutely certain to do justice between the parties can be laid down for such a case. Some time must be taken arbitrarily at which prices are to be ascertained and estimated, and the day of the breach of the contract or of the commencement of the suit should perhaps be adopted under such circumstances."

In a note to this case (42 Am. Dec. 50) it is said:

"Market value, when an element in damage, is not to be fixed according to sudden or transient inflations or depressions in prices but according to the range of the entire market." Smith v. Griffith, 3 Hill (N. Y.) 333, 38 Am.

It would seem, therefore, that in respect to the breach of the contract as to the 250 bales the delivery of which was due at stated periods between October 15th and December 15th, inclusive, the contract is to be treated as broken October 10th, and the price at that date, in the absence of any evidence as to the price at the date of each delivery, should be adopted. To this defendant cannot object because the only evidence is that the difference between the contract price and the price at which the cotton could have been obtained in Birmingham was less than the price at which the 50 bales were sold on October 12th. Assuming, therefore, that plaintiffs could have bought the cotton in Birmingham at 9.67½ cents, to this should be added the freight which was 54 cents per 100 pounds, thus giving the cost to plaintiffs to deliver the cotton in Fayetteville, N. C. In the absence of any evidence to the contrary, a bale of cotton will be fixed at 500 pounds; this being the evidence upon that point. Plaintiffs lost on the 50 bales (being the remainder of the one hundred bales bought on September 28th at 10.62½ cents) $237.50, to which loss they are entitled upon the principle applied to the 50 bales actually tendered; this purchase being made by them under a subcontract to enable them to perform the contract as to the second delivery. The damage therefore which plaintiffs have sustained for amounts actually paid out and loss of profits comes to this:

| | | | |
|---|---|---|---|
| Loss on 50 bales tendered defendant Oct. 10th and resold including expenses | | $ 351 89 | |
| Loss of profit on this cotton | | 213 45 | |
| Aggregate | | | $ 565 34 |
| Loss on 50 bales purchased Sept. 28th and resold Oct. 12th | | | 237 50 |
| Profit on 250 bales of Oct. 10th, 1911 | | | |
| Contract price at 11½ cents | $14,375 00 | | |
| Cost of cotton in Birmingham | $12,093 75 | | |
| Freight | 675 00 | 12,768 75 | 1,606 25 |
| Total damages | | | $2,409 09 |

To this interest should be added of an average date November 15, 1911. The jury are instructed to answer the issue accordingly. For this amount judgment may be drawn.