## ROLLER v. GEORGE H. LEONARD & CO.

(Circuit Court of Appeals, Fourth Circuit. November 4, 1915.)

### No. 1333.

1. DAMAGES ⊂⇒208(1)—ACTION FOR BREACH—QUESTIONS FOR JURY—DAMAGES.
   Plaintiffs were engaged in the business of buying and selling oak extract used by tanners. They did not store the extract, but on securing an order from a purchaser sent a similar order to a manufacturer, with whom they had a contract, for shipment direct to the purchaser. They made a contract for the purchase at a stated price of not less than 5,000 barrels of extract from defendant, who had a plant which was then uncompleted and the quantity it could produce in a given time uncertain. By a supplemental contract no stated time for delivery was fixed, but defendant was required to report each week the material on hand and the estimated quantity of extract which would be made the following week, and to make shipments as instructed as rapidly as possible until the contract quantity was delivered. After that defendant made but one shipment, did not make the weekly reports, and later, on the ground that his plant had become incapacitated, notified plaintiffs that he would make no further deliveries. Subsequently plaintiffs sent orders on the same day, aggregating over 2,600 barrels, which were not filled, and they brought an action for damages for breach of the contract. *Held*, that the two contracts must be construed together, and that in view of the surrounding circumstances and the known condition of defendant's plant, so construed, the large order was not such as was contemplated, and plaintiffs were not entitled to recover as damages the profit they would have made by resales if such order had been filled; that the only way to fairly estimate their damages was to determine the quantity of extract defendant could

---

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

have produced weekly by using diligence in procuring materials and operating his plant and the difference between the contract price and the market price each week of such production, both of which were questions for the jury.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 54, 64, 68, 533, 534; Dec. Dig. ☜208(1).]

2. CONTRACTS ☜313 — RENUNCIATION — RIGHTS AND REMEDIES OF OTHER PARTY.

On the express repudiation of an executory contract by one party, the other party may at his election accept such repudiation as ending the contract, or may treat it as inoperative; if he elects the latter the contract is kept alive as to both parties, and he can enforce it only in accordance with its terms.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1279; Dec. Dig. ☜313.]

3. CONTRACTS ☜169—CONSTRUCTION—EXTRINSIC EVIDENCE TO AID CONSTRUCTION.

In construing a contract with respect to the damages recoverable for its breach, the surrounding conditions and circumstances when it was made must be considered, to ascertain what damages in case of breach might reasonably have been in the contemplation of the parties.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 752; Dec. Dig. ☜169.]

In Error to the District Court of the United States for the Western District of Virginia, at Harrisonburg; Henry Clay McDowell, Judge.

Action by George H. Leonard & Co., to the use of Marden, Orth & Hastings, against John E. Roller, trading as the Excelsior Oak Extract Company. Judgment for plaintiffs, and defendant brings error. Reversed.

For prior opinion, see 201 Fed. 886, 120 C. C. A. 224.

Rudolph Bumgardner, of Staunton, Va. (Bumgardner & Bumgardner, of Staunton, Va., and John E. Roller, of Harrisonburg, Va., on the brief), for plaintiff in error.

R. T. Barton, of Winchester, Va. (Barton & Barton, of Winchester, on the brief), for defendant in error.

Before KNAPP and WOODS, Circuit Judges, and CONNOR, District Judge.

CONNOR, District Judge. [1] The record, read in connection with the record in the writ of error in the same case, decided by this court on December 21, 1912 (201 Fed. 886, 120 C. C. A. 224), and the opinion of Judge Rose, discloses the history of the transaction out of which the controversy arose and the questions presented upon the assignments of error. The defendants in error, hereinafter referred to as plaintiffs, were, on and prior to September 12, 1904, engaged in business in Boston, Mass, as dealers in tanning materials, and in their course of business bought and sold oak extract. Their principal witness, Mr. Orth, says:

, "The custom of business was for us, when we received orders from our customers, to send an order, with shipping directions, to the manufacturers, with whom we had contracts, to ship the extract necessary to fill the sale direct

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

to our customers. In other words, as we received our orders from our purchasing customers, we gave directions in the form of 'orders' to the plants under contract with us to furnish extract, so that the extract would be shipped direct from the plant to the customers, thus placing buying orders with us. We allotted these orders to the plants under contract with us, as convenience would dictate. In order to enable us to carry on this business, in which we acted in the sense of intermediaries, or sale brokers, it was essential that we know when and in what quantities the extract will be delivered by the manufacturers as without this information we have no guide to enable us to make sales to customers, calling for delivery of a specific quantity of extract at a given time and place. * * * We store no extract ourselves, as our business was to buy for the purpose of selling again. We would sell extract to the tanner and if the tanner did not get his extract on time his hides were injured. In some instances the tanners had facilities for storing a given quantity, but ordinarily they bought as they needed it for current use. Some of our contracts of sale to customers called for as much as a tank car a week. It is the custom of manufacturers to store extract; one concern I know of * * * insisted on carrying 2,000 barrels all the time."

The manner in which the testimony of plaintiff in error, hereinafter referred to as defendant, is printed, does not present a connected story. For the purpose of discussing the questions presented upon the record, it discloses: That defendant, John E. Roller, was a lawyer residing in Harrisonburg, Va. He says that he "had about quit the practice and was engaged in other operations." During the year 1903 he organized the Excelsior Oak Extract Company for the purpose of making and selling oak extract used for tanning hides. The plant was located some distance from Harrisonburg. Gen. Roller, the president and principal owner, says that he knew nothing about the details of the business—the method of manufacturing and selling the extract —relied entirely upon the men employed by him. "I didn't know a thing in the world about it. I didn't even know the meaning of certain technical words you use now. I was absolutely without experience." There is evidence tending to show that the plant, or machinery, used in manufacturing the extract, was in September, 1904, incomplete. G. S. McCarty, president of the American Anniline & Extract Company, engaged in selling extract, visited Gen. Roller at Harrisonburg. Mr. McCarty says:

"During this trip here he took me out to the plant and I looked it over, and while on that trip we made this arrangement, for me to sell his extract on a commission basis. * * * I was to represent him and be his agent. I looked over the plant and made recommendation to him in great detail as to what he might do to make the plant as economically as I then knew. I returned to Philadelphia, and, of course, immediately undertook to dispose of what we estimated he would produce that year."

After describing his efforts to make contracts for the sale of the extract, and of a contract made with Grattan & Knight, he says that he met Leonard & Co., who were "great buyers" of extract, and became, through his efforts, "interested." Mr. Orth, of the firm of Leonard & Co., came to Philadelphia, "and we went over the question pretty thoroughly and he said that he could market the extract, and, resulting from that, Gen. Roller came up at my solicitation, of course, to deal directly with Leonard & Co., as I did not wish to make a deal with Leonard & Co. for the output of his plants." After some

negotiation, during which it was agreed that McCarty was to receive a commission of 4 per cent., the parties entered into and signed a contract, the essential terms of which are:

"Philadelphia, Pa., Sept. 12, 1904.

"American Anniline & Extract Co.—Gentlemen: We hereby buy from you, and you sell to us, a certain quantity of extract to be made by the Excelsior Oak Extract Company, hereinafter specified, at the following prices and under the following conditions, terms, and provisions: Four thousand (4,000) barrels to eight thousand (8,000) barrels or equivalent in tank cars of chestnut oak extract. This contract shall be made entirely from chestnut wood, or three-quarters chestnut wood and one-quarter oak wood, with the bark on, or from 85 per cent. chestnut wood and 15 per cent. chestnut oak bark, as we may direct from time to time. As to quantity, it is our option whether we shall take more than four thousand (4,000) barrels, we to declare our option within ten days after you let us know definitely whether you can ship us more than the four thousand barrels. Shipments filling this contract shall be made at fairly regular intervals between September 15, 1904, and September 15, 1905, as we order from time to time."

The contract contains stipulations as to price, terms of payment, guaranty of percentage of tannic acid, etc., and an agreement for sale of 1,000 barrels of pure oak bark extract at a price fixed "under the same terms and conditions set forth above as to time of delivery, terms of payment, etc.," and an option to Leonard & Co. to take any further quantity that the other party might make, etc. It was also stipulated that:

"You agree to make no further sales of extract, except the acceptance of the two options you have out, until the settling of the above options. It is further agreed that shipments in tank cars shall be made only when convenient and satisfactory to both parties."

This proposition was signed by Leonard & Co. and accepted by the American Anniline Extract Company and the Excelsior Oak Extract Company. The entire evidence is in the record, showing the attitude of the parties and the conditions under which the contract of September 12, 1904, was entered into. For reasons not necessary to set forth the defendant did not ship the quantity of extract called for by the contract. On July 22, 1905, the parties again met in Philadelphia, and, after discussion and negotiation, entered into a supplemental contract, the essential terms of which are:

"In consideration of our having failed to make deliveries on our contract with you, dated September 12, 1904, according to its terms, and in consideration of your having given us further time in which to fill said contract, we hereby agree to: Report each Wednesday approximate quantity of wood, bark extract, and tank cars on hand, estimated quantity extract will make the next week. The shipments of extract made since prior report. Make shipments, as instructed by you, as rapidly as possible, until the contracted quantity, 5,000 barrels, is delivered. Make shipments for nobody except Grattan & Knight Manufacturing Company, if there is still any extract due them on your contract with them made prior to September 12, 1904. To procure this year as much bark as possible, and make it into our bark extract, from time to time, as instructed by you."

The other portions of the contract relate to price, terms, etc. Defendant failed to make the reports on each Wednesday, in accordance with the terms of the contract of July 22, 1905, although plaintiffs re-

peatedly called upon him to do so. On August 8, 1905, defendant wired plaintiffs that he could ship one car bark extract "this week and another middle of next week." In response to this telegram, plaintiffs sent defendant, August 9, 1905, orders and shipping direction for the two cars. He filled only one of them. No other extract was delivered by the defendant on the contract. On August 19, 1905, Gen. Roller wrote plaintiffs that his plant was "again in bad shape"—that, "as you know, I am not an expert in such matters, and I am compelled to intrust the management of the plant to others"; that his foreman reports that he is unable to make extract until his stock is completed, because the boilers are not of sufficient capacity to make steam to run the several parts of the plant; that he "sees no way to escape the delay"; that he intends to put in new and sufficient machinery. He concludes:

"I am perfectly willing to stand whatever loss or damage I should pay, reasonably and justly, for I have no purpose to do anything else than what is right between us."

No orders were sent defendant for extract subsequent to August 9, 1905, until September 19, 1906. Plaintiffs wrote and wired defendant frequently in regard to his failure to make reports, etc. On September 12, 1906, Mr. Orth had an interview with Gen. Roller in regard to the situation. He says:

"I asked him what he was going to do about the contract. I had heard that he was selling extract to other parties. I had caused one of my friends to purchase some of his extract in order to assure myself that he was selling. Roller said in the beginning that, no matter what I would say, he would not feel called upon to make an answer, but asked me to let him know what our demands were. He said that the existing contract with Spencer, which he was now filling, had been made by Wise, and he could cancel whenever he wanted to. I told him that our demand was that he comply with his contract. When asked what he proposed to do about his contract with us, he said he would do nothing until he had seen his brother, O. B. Roller (an attorney). He said that the costs of making extract had advanced. He requested me, however, to take no action until he had consulted his brother, and to put our demand in writing. This I did when I returned to Boston, in my letter dated September 19, 1906, which is here read to the jury. This letter was not answered."

The letter will be noted later.

Gen. Roller says:

"I made no reports under the contract of July 22, 1905. My plant, at that time, to April 30, 1906, was out of commission. I was making no extract, and had no reports that I could make such as was required by this contract. * * * I made no reports under the contract of July 22, 1905, for from that date up to April 30, 1906, the plant was not in condition, and I had nothing to report, and I made no reports, because I could not make such as the paper contemplated. Coming in the next place to the interview with Mr. Orth and myself on the 12th of September, 1906, one of the things that occurred then was that I charged him with knowing that the plant was not in operation, and had not been in operation, and that no report was necessary, or could have been made, and he didn't deny it, and also to what occurred then. I then and there repudiated the idea that I was going to carry out that contract; I told him in as distinct words as I could employ. I told him that it would be a great hardship on me to perform that contract. I asked him what demands he would make on me to settle that contract. When the letter came

of September 19, 1906, with the statement of what the demand was, he simply demanded the last item he could demand, the last pound of flesh, so to speak. I told him that I declined to carry out that contract, and had sold Mr. Spencer, and that my contract with Mr. Spencer was for the sale of the extract on commission, but that I could cancel my contract with him at any time; that all being in view of the fact that we could make a settlement, and I told him that we would not even do that until I saw my brother, Col. Roller, and took his advice upon the subject."

Upon returning to Boston, Mr. Orth, on September 19, 1906, wrote defendant, reciting the terms of the contract and the failure on the part of defendant to make reports, the conversation of September 12, 1906, and inclosing four orders for extract, aggregating 2,640 barrels of pure oak extract and chestnut oak extract. These orders called for "prompt" shipments. The defendant did not fill either of them. Plaintiffs, by a method of calculation, which it must be conceded, as claimed by defendants' counsel in his brief, is somewhat confusing, arrives at the conclusion that, by reason of defendants' breach of the contract, they have been endamaged to the amount of $9,965.79.

Plaintiffs instituted this action for the recovery of the damages alleged to have been sustained by them by reason of defendants' failure to deliver the quantity of extract called for by the contract. Plaintiffs, on November 25, 1909, filed a declaration containing three counts. It is not deemed necessary to analyze the declarations at this time. Upon defendants' motion a bill of particulars was filed. The cause was brought to trial upon the pleadings and bill of particulars. At the conclusion of the evidence, the judge, having excluded evidence offered by plaintiff to show damages alleged to have been sustained subsequent to July, 1906, to which exception was duly taken, judgment was rendered for defendant, and a writ of error prosecuted to this court. The opinion of Judge Rose (201 Fed. 886, 120 C. C. A. 224) states the course taken at the trial and the ground upon which the court based its ruling. After a recital of the allegations of the declaration, he says:

"The learned judge below was of the opinion that by a fair construction of the contract of July 22, 1905, the buyers were bound to order, and the seller bound to deliver, the extract in fairly regular quantities. He held that the failure of the seller to make the weekly reports called for by his contract relieved the buyers of any obligation to give orders, but that such failure did not, of itself, extend the time for the performance of the contract. He ruled that such time expired not later than July, 1906. He reached this conclusion by assuming that the contract of July, 1905, called for substantially the same rate of delivery as that of September 12, 1904, which was 5,000 barrels in 12 months, or 416⅔ barrels per month. He said that 3,974 barrels, which were undelivered when the contract of July 22, 1905, was made, should, at this rate, have been delivered in 9.53 months—that is to say, by some time early in May, 1906—and that it could not be assumed that the parties had contemplated that the time of such delivery would extend beyond July, 1906. He thereupon notified counsel for the buyers and the seller that, at the trial, he would not allow the former to offer evidence in support of any item of damage alleged in their bill of particulars."

As explained by Judge Rose, this announcement resulted in a judgment for defendants. Upon the hearing in this court, the sole question presented, and decided, was whether the judge was in error in

excluding plaintiff's evidence offered for the purpose of showing damage alleged to have been sustained, and specified in their bill of particulars, by reason of the failure to fill orders given subsequent to July, 1906. Upon this question this court decided:

"That upon the allegations of the declaration it was error to rule, as a matter of law, that the time during which the buyers could call for deliveries had necessarily expired before September 18 and 19, 1906 (the dates upon which the last orders were placed)."

This conclusion is supported by reasons set out in the opinion; the learned judge writing for the court carefully refraining from expressing any opinion in regard to other phases of the case.

Upon the second trial it appeared that, with the exception of the telegram of August 8, 1905, followed by the shipping orders of August 9, 1905, defendant made no report of quantity of extract on hand. Plaintiffs wired and wrote a number of letters calling for reports, and complaining of defendants' failure to make reports, or respond to their letters. Upon the conclusion of the evidence, plaintiffs moved the court to direct the jury to return a verdict for this amount. The motion was allowed. Defendant excepted.

Postponing the consideration of questions of subordinate interest, the assignments of error present several questions the answer to which are determinative of this writ of error. Defendant attacks the validity of the contract, alleging that he was induced to enter into it by false representations of plaintiff Orth, co-operating with his own agent, McCarty. He says that they entered into a conspiracy to induce him, by making false and fraudulent representations respecting the manufacture of the extract, to execute a contract which, as they well knew, he could not under the conditions known to them perform. While in his letter of August 19, 1906, he gives as a reason for not complying with the contract that his mill, or plant, did not have sufficient capacity to enable him to make the extract, it is manifest from what he said to Mr. Orth on September 12, 1906, that he determined to repudiate the contract because of the alleged fraud practiced upon him by Orth and McCarty. In the trial of the case, the defendant took an active part, conducting the cross-examination of plaintiffs' witnesses and testifying in his own behalf. He was also represented by counsel. In this court he filed a brief in propria persona, a large part of which is directed to his contention that he was induced to execute the contract by the fraudulent representations of Orth and McCarty. Defendant excepts to the instruction given the jury for that:

"The court erred in taking away from the jury the right to pass upon the question of fraud in the procurement of the contract sued upon and fraud in the contract itself, and in not allowing them to pass upon said issue."

This exception is saved in the assignment of error No. 3. The defendants' contention in regard to this phase of the defense is based upon the conversation between Orth and McCarty and himself on July 22, 1905. His theory seems to be that they had entered into a con-

spiracy to defraud him by making certain representations to induce him to execute a contract which was unfair to him and which they knew he could not perform. McCarty was the agent of defendant, and the amount of compensation which he was to receive for the services rendered was dependent upon sales made by him. It is difficult to understand why he should have induced defendant to make a contract which, by reason of impossibility of performance, deprived him of his commission. While it may be that the terms of the contract were difficult of performance and wanting in mutuality of obligation, we are unable to find in the testimony any evidence of a conspiracy on the part of Orth and McCarty, or any false representations of essential facts upon the part of either, sufficient to invalidate its obligations. The defendant's exception, in that respect, is without merit.

Coming to the consideration of the contract of July 22, 1905, read in the light of the contract of September 12, 1904, the question arises: What obligations were assumed and what rights were secured to the respective parties? That we may ascertain their intention, it is essential that we understand the subject-matter, the relation of the parties thereto, and the purpose which they had in view in entering into the contract. While, in the contract of September 12, 1904, words appropriate to an executed contract of purchase and sale are used, it is manifest that no sale, in a legal sense, of extract was made or intended. Both contracts are in all respects executory. Reading them together, it appears that defendant agreed to sell to plaintiffs as much as 5,000 barrels of extract to be thereafter manufactured by defendant, at his plant in Virginia, at the prices and upon the terms named. The time fixed for its delivery in the contract of September 12, 1904, 12 months, is omitted from that of July 22, 1905; the only limit in that respect being that defendant was to make shipments "as instructed by plaintiff, as rapidly as possible, until the contracted quantity, 5,000 barrels, is delivered." For the purpose of enabling plaintiffs to be advised as to the ability of defendant to make shipments, he agreed "to report each Wednesday approximate quantity of wood, bark extract, and tank cars on hand, the estimated quantity of extract which defendant would make during the following week, and the shipments of extract made since prior report." The reason which induced the parties to make these provisions in the contract are made apparent by reference to the extrinsic evidence.

Defendant concedes that he made no reports as called for by the contract and assigns his reason therefor. The reasons given do not constitute a valid excuse for his failure to make the weekly reports. For this breach of the contract defendant is liable to an action. Plaintiffs insist that the failure of defendant to make the reports as stipulated relieved them from the duty of sending orders. If, by this, it is meant that plaintiffs were entitled to sue for such damages as they sustained by reason of defendants' failure to make the reports, we concur with them. It is difficult to perceive how more than nominal damages would have been recoverable for this breach of contract. The question, however, is not of practical importance as affecting the plaintiffs' cause of action.

[2] Defendant, on September 12, 1906, expressly repudiated the contract and notified plaintiffs that he did not intend to perform or discharge its obligations. The reasons assigned by him, alleged fraud in the inducement, being, as we have held, invalid, his attempted renunciation was without legal justification. The declaration on the part of defendant not to perform the terms or discharge the obligation of his contract gave to plaintiffs a right to elect between two courses of conduct. The condition brought about by defendant's renunciation of the contract is described by Chief Justice Fuller in Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953, as "an anticipatory breach of an executory contract by an absolute refusal to perform it." In this condition it is held that:

"The promisee, if he pleases, may treat the notice of intention as inoperative, and await the time when the contract is to be executed, and then hold the other party responsible for all the consequences of nonperformance; but in that case he keeps the contract alive for * * * the other party, as well as his own; he remains subject to all his own obligations and liabilities under it, and enables the other party, not only to complete the contract, if so advised, notwithstanding his previous repudiation of it, but also to take advantage of any supervening circumstance which would justify him in declining to complete it. On the other hand, the promisee may, if he thinks proper, treat the repudiation of the other party as a wrongful putting an end to the contract, and may at once bring his action as on a breach of it; and in such action he will be entitled to such damages as would have arisen from the nonperformance of the contract at the appointed time, subject, however, to abatement in respect of any circumstances which may have afforded him the means of mitigating his loss." Roehm v. Horst, supra.

This principle is stated by Lord Esher, Master of the Rolls, in Johnson v. Milling Co., 16 Q. B. Div. 467:

"When one party assumes to renounce the contract, that is, by anticipation, refuses to perform it, he thereby, so far as he is concerned, declares his intention then and there to rescind the contract; such a renunciation does not, of course, amount to a rescission of the contract, because one party to a contract cannot, by himself, rescind it, but by wrongfully making such a renunciation of the contract, he entitles the other party, if he pleases, to agree to the contract being put an end to, subject to the retention by him of his right to bring an action in respect to such wrongful rescission. The other party may adopt such renunciation of the contract by so acting upon it as in effect to declare that he, too, treats the contract as at an end, except for the purpose of bringing an action upon it, for the damages sustained by him in consequence of such renunciation." Page on Cont. 1441.

Applying this principle to the condition in which the parties were placed by the declaration of defendant, on September 12, 1906, that he renounced, repudiated, and did not intend to perform the contract, plaintiffs were entitled to "take him at his word" and sue at once for the breach of the contract. Plaintiff's declaration, drawn with much care, contains three counts. In each count the contracts are set out, and at much length a recital of the several defaults, or breaches on the part of defendant, followed by the averment that:

"By reason of the tortious conduct of the defendant, and his total disregard for, and repudiation of, his obligation, and breach of his contract, as aforesaid, and his failure to answer plaintiffs' letters and telegrams, plaintiffs were wholly prevented, and therefore excused, from any and all obligation on their part to give to defendant specific orders and directions for shipments,

and are entitled, without such specific orders and directions, to demand and recover from the defendant the loss which plaintiffs incurred and sustained by reason of the failure of defendant to perform and his disregard and breach of his contract as aforesaid."

Following is the ad quod damnum clause. It appears, as said by counsel, that much difficulty was encountered before the parties joined issue—demurrers were interposed, one sustained, an amendment made, and a second demurrer overruled, followed by demands for bills of particulars. We construe the first count to mean that plaintiffs elect to treat the contract as breached by the renunciation on the part of defendant on September 12, 1906, and sue for such damages as they sustained thereby, without averring that orders for shipments were made. It is said:

"If a contract is broken by renunciation, before performance, the adversary party may recover damages occasioned by such breach, but he cannot, without performance, recover upon the contract, as if he had performed the same." Page, Cont. § 1441.

This view does not affect the right of action, but merely the measure of his damages. When suit is brought for a breach of contract before the time for performance, as in Roehm v. Horst, supra:

"The plaintiff is entitled to compensation, based, as far as possible, on the ascertainment of what he would have suffered by the continued breach of the other party down to the time of complete performance, less any abatement by reason of circumstances of which he ought reasonably to have availed himself."

In that case the defendant was under contract to deliver a fixed quantity of hops, in four installments, at specified periods of time, without any further demand on part of vendee. He renounced his contract before the time arrived for all of the deliveries. Plaintiff, without waiting for the expiration of the period fixed by the contract for delivery, sued for damages. He was permitted, on the question of damages, to show at what price he could have made subcontracts for forward deliveries according to the contracts.

In Weld v. Manufacturing Co. (D. C.) 205 Fed. 770, the plaintiff was under contract to buy from defendant cotton to be delivered in specific quantities at fixed dates. Prior to the date of delivery it renounced the contract and notified plaintiff that it would not take the cotton. Suit was brought without waiting for the expiration of the period fixed for delivery. The damage was fixed upon the basis of the price of cotton at the date delivery was to be made and accepted.

"The man who wrongfully renounces a contract into which he has deliberately entered cannot justly complain if he is immediately sued for a compensation in damages by the man whom he has injured; and it seems reasonable to allow an option to the injured party, either to sue immediately, or to wait till the time when the act was to be done, still holding it as prospectively binding, * * * which may be advantageous to the innocent party, and cannot be prejudicial to the wrongdoer. An argument against the action before the 1st of June (the due date of the first delivery) is urged from the difficulty of calculating the damages; but this argument is equally strong against an action before the 1st of September, when the three months would expire. In either case, the jury in assessing the damages would be justified in

looking to all that had happened, or was likely to happen, to increase or mitigate the loss of the plaintiff down to the day of trial." Roehm v. Horst, supra.

Mr. Justice Crompton, in Hochster v. De La Tour, 2 El. & Bl. 678, said:

"The injured party, not in default, may say to the other party: Since you have announced that you will not go on with the contract, I will consent that it shall be at an end from this time; but I will hold you liable for the damage I have sustained, and I will proceed to make that damage as little as possible by making the best use I can of my liberty."

The distinction between the instant case and Roehm v. Horst, supra, Weld v. Mfg. Co. (D. C.) 205 Fed. 770, and the cases cited in the opinions therein, is found in the fact that in those cases the time at which the articles contracted to be delivered was fixed in the contract, whereas here the extract is to be shipped "as instructed" by "plaintiffs, as rapidly as possible"; the orders were to be given from "time to time," all of which is of necessity uncertain in point of time. When the date of delivery is fixed, the measure of damages is declared to be the difference between the contract price and the market price of the article at the time when, under the contract, it should have been delivered. Benj. on Sales, § 1012; Boorman v. Nash, 9 B. & C. 145. No definite time being fixed for the shipment of the extract, it being evident from the terms of the contract, construed in the light of the extrinsic evidence, that it was to be shipped at different periods of time and in uncertain quantities—both to be fixed by instructions from plaintiffs, complied with as rapidly as possible. These elements of uncertainty, in regard to the right of plaintiffs and the obligation of the defendant, render it difficult to fix, as a matter of law, the measure of damages or the method of ascertainment.

[3] It is manifest, however, that the contract was of value to plaintiffs and of binding obligation upon defendant—that in wrongfully renouncing and repudiating its obligations the defendant has deprived plaintiffs of a legal right for which he is liable to an action. If, by reason of the uncertainty in the terms of the contract, the value of this right is so indefinite, incapable of ascertainment by any process known to the law, plaintiffs must be content with nominal damages, which always follow from a breach of contract. Actual compensatory damages must be proved with at least reasonable certainty. They cannot be ascertained by mere speculation and conjecture. Accordingly, if there is no data for computing damages, no substantial damages can be given, even if it is clear from the evidence that some damage has been sustained. Page on Cont. § 1575. Certain elementary principles have been established, for the guidance of courts and juries, in fixing the measure of damages recoverable for breach of contract. In Hadley v. Baxendale, 9 Exch. 341, Baron Alderson said:

"When two parties have made a contract, which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered, either arising naturally—i. e., according to the usual course of things—from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it."

This language is cited with approval in Howard v. Stillwell, etc., 139 U. S. 199, 11 Sup. Ct. 500, 35 L. Ed. 147. Applying this principle to this record, the case comes to this: Plaintiffs, engaged in buying and selling oak extract, used by persons engaged in tanning hides, receiving and accepting orders, from such persons, of uncertain time and quantity, for the purpose of enabling them to accept such orders as came in the course of their business, made contracts with manufacturers of the extract. Defendant owned a plant, or mill, which was, at the date of the first contract, incomplete, located in a section where oak wood, from the bark of which the extract was made, was accessible. The capacity of the mill and the quantity of bark which he would reasonably expect to secure was uncertain, but capable of estimation. He desired to sell extract as it was made. Plaintiffs did not store the extract, but, upon receipt of orders from their customers, sent shipping directions to those with whom they had made contracts. The extract was shipped direct to the plaintiffs' customers. The profit which plaintiffs made from their business consisted in the difference between the price for which they purchased, fixed in the contract, and the price at which they sold to their customers, dependent upon the market prices at such dates as sales were made.

In the light of these conditions, known to both parties, they entered into the contract out of which this controversy has arisen. The language used by them, in so far as it is uncertain, or open to construction, must be construed in the light of, and with reference to, these conditions, and their intention, so far as possible, ascertained. The two contracts must be read together, and the terms of both must be considered as an entirety, and their meaning, as a whole, ascertained. It is said:

"The parties to a contract choose to express their intention, in view of all the surrounding circumstances. It is practically impossible to state these facts in the contract, and is rarely, if ever, attempted. The court which construes the contract must therefore either disregard all the material facts which led the parties to express their intention as they did, or else admit extrinsic evidence of the surrounding facts and circumstances. In this dilemma, the courts have chosen the latter alternative. It is a recognized rule of construction that the court will place itself in the position of the parties who made the contract, as nearly as can be done, by admitting evidence of the surrounding facts and circumstances, the nature of the subject-matter, the relation of the parties to the contract, and the object sought to be accomplished by the contract. * * * Even though the contract is in writing, extrinsic evidence of the surrounding circumstances is admissible to aid the court to determine the intention of the parties." Page, Cont. 1123.

This principle is illustrated in a large number of cases cited by the author. Plaintiffs acquired, by the contract, the right to instruct defendant to make shipments of the extract to their customers at such points as they directed. The time and quantity of each shipment was to be fixed by plaintiffs. The entire quantity was fixed at 5,000 barrels. The only limit in respect to the time of shipments, fixed in the contract, was they should be "from time to time" (and this, in view of the course of plaintiffs' trade and business, should be construed to mean as they received orders from their customers) and "as rapidly as possible" (this must be construed as referring to the capacity of

defendant's mill properly operated). It is manifest that neither of the parties contemplated an immediate, or at any time a single, order for the entire quantity.

Light is further thrown on the intention of the parties by referring to the provision which required defendant "to procure this year as much oak bark as possible and make it into our bark extract, from time to time, as instructed by you." As further indication of what was in the minds of the parties in respect to the quantity and time of giving instructions for shipments, it will be observed that defendant obligated himself to—

"report each Wednesday approximate quantity of wood, bark extract, and tank cars on hand. Estimated quantity extract will make next week. The shipments of extract made since prior report."

It is manifest that the purpose of requiring defendant to make the weekly reports was to enable plaintiffs to know the extent to which they could safely accept orders and enter into contracts with customers. It was this contract which defendant breached, and it is the value of this contract which plaintiffs are entitled to recover as compensation for the injury sustained. For the failure to fill specific orders placed by plaintiffs, within the terms of the contract, prior to September 12, 1906, plaintiffs are entitled to recover the difference between the contract price, which they were to pay defendant and the price at which they sold. This is fixed at $119.58.

In regard to the remainder of the quantity called for by the contract, plaintiff's claim is substantially as follows:

(1) That on September 19, 1906, they had a call from Grattan, Knight & Co. for 120 barrels pure bark extract at 2 cents per pound, which they instructed defendant to supply. His failure to do so disabled them from making the sale, whereby they lost the difference in contract price at which the sale would have been made, $165.

(2) That on the same day they had a call for 60 barrels pure bark extract from Grattan & Son at 2½ cents per pound, which they directed defendant to fill; that by reason of his failure to do so they were not able to make the sale, sustaining by the same method of computation $254.58. If the jury should find the facts to be as testified, and that these orders came within the terms of the contract, it would seem that they would constitute elements of damage for which defendant would be liable.

(3) That on the same day they received from Grattan & Knight Manufacturing Company a verbal offer to purchase a large quantity of pure bark extract, which they could not accept on account of defendant's renunciation of his contract, and thereby lost a profit of $2,976. They did not place any order with defendant for this extract. The theory upon which plaintiffs base this claim is that the failure to make reports and the renunciation of the contract relieved them of the duty of placing orders. This contention presents a number of questions of fact. It cannot be held, as a matter of law, that defendant was, upon a fair construction of the contract, under obligation to ship on one day so large a quantity of extract, or that plaintiffs were

entitled to charge him up with profits alleged to be lost in this manner. The questions upon which the right and liability of each party depends upon this claim should be submitted to the jury under proper instructions.

(4) That plaintiffs on the same day, September 19, 1906, had a call from the American Leather Company for 1,200 barrels chestnut oak extract, at a price not stated. For this they gave defendants shipping order. Plaintiffs had purchased from Young & Kimball, two days before, a quantity of extract, and from this they shipped their customer 840 of the 1,200 barrels called for. The difference in the price which they paid for this extract and the price fixed in their contract with defendants they charged to defendant—$1,564.60.

(5) That on the same day they had a call from the Anglo-Canadian Leather Company for 1,200 barrels chestnut oak extract, for which they gave defendant a shipping order, which was not filled. This order they filled from extract purchased from Wilson & Kimball and charged defendant with difference in price, as in the next preceding order—$2,234.40.

(6) The same course was pursued with this item, by which they charge defendant $132.30.

(7) Plaintiffs, by some method of reasoning which is not very clear, allotted certain other orders to defendant, and, without giving him any shipping orders therefor, charged him with alleged loss—$1,801.58. It is quite difficult to understand and describe the processes by which these results were reached.

The testimony of Mr. Orth, in regard to the basis upon which he assessed plaintiffs' damages, is not at all clear, and leaves many questions and inferences open for the consideration of a jury, under proper instructions by the court. In respect to much of his testimony, reasonable men may very well differ. Without expressing an opinion in regard to the weight which should be attached to it, which is entirely for a jury, we can easily perceive that a number of his methods of fixing the measure and amount of alleged damages may not be accepted by the jury.

We are of the opinion that the contract did not authorize plaintiffs to arbitrarily, or otherwise than in their regular and usual course of business, and the capacity of defendant's mill properly operated, call upon defendant to ship extract in quantities, or at periods of time, not within the contemplation of the parties, as expressed in the written contract, and conditions under which it was executed. While defendant, by failing to make the weekly reports, relieved plaintiffs of the duty of basing orders on such reports, and by notifying plaintiffs that he would not ship any extract relieved them of the duty of sending orders, and by these breaches of his contract subjected him to an action for damages, they did not entitle plaintiff to demand of him that which he never promised or contracted to do, or to create arbitrarily conditions which were not contemplated by either party at the time the contract was entered into. The principle upon which the rights of plaintiffs and liability of defendant is fixed is stated by Mr. Sedgwick:

"When a contract is performable in installments, such, for instance, as a contract to manufacture and deliver goods in stated amounts from time to time, and there is a repudiation during the period of performance, the damages for a breach consisting in the nonperformance of subsequent installments is to be estimated as at the time of performance of each [installment], and not as at the time of the performance of the last installment. If, for instance, between the time of the first breach, the value of the goods to be delivered fluctuates, the buyer who has failed to receive the installment due him cannot demand damages, based on the value of the goods at the time the last installment should have been delivered, but he must be content with a basis of compensation which will give him the value of each installment at the time it should have been delivered." 2 Dam. § 636b.

The principle upon which damages are to be assessed in such cases is illustrated in Brown v. Miller, L. R. 7 Ex. 319. Defendant contracted to sell and deliver to plaintiff a large quantity of iron to be delivered in about equal portions—September, October, and November, 1871. During the month of August defendant notified plaintiff that he did not intend to deliver any iron. Plaintiff, after the expiration of the time for the last delivery had passed, sued defendant for damages for breach of their contract. Kelly, C. B., said:

"Now the proper measure of damages is that sum which the purchaser requires to put himself in the same condition as if the contract had been performed. The plaintiff might, if he had so elected, have treated the contract as at end, when the defendant announced his intention to break it. But that is a matter of election on plaintiff's part, and even although he had elected then to treat the contract as broken, yet in considering the question of damages they would still be estimated with reference to the time at which the contract ought to have been performed; that is, in this case, at the ends of the months of September, October, and November."

In Joslin v. Irvine, 6 H. & N. 512, 30 L. J. Ex. 78, defendant contracted to deliver naphtha in weekly parcels. He failed to perform his contract. Wilde, J., said:

"I want to know the market price at the end of the first, second, and third weeks, when the naphtha was to have been delivered. The damages must be assessed with reference to the market price on each of the days fixed for the delivery of the naphtha."

In Long v. Conklin, 75 Ill. 32, defendant contracted to deliver wood —the quantity plaintiffs would need as they required it for their brick-making business. He failed to deliver the wood. The court sustained the trial court in admitting evidence of the value of wood throughout the brick-making season as plaintiffs required it, saying:

"Appellees had a right to make purchases at the times when, by the contract, appellant was to have delivered the wood; that is, at the times they should need it through the season for use. The law would not compel them to buy all at once that which they could only use in parcels from time to time, nor would it compel them to enter into a continuing contract with any other person."

For the same reason plaintiffs would not be permitted to demand of defendant all of the wood on a day arbitrarily fixed by them. In Del. & Hudson Canal Co. v. Mitchell, 92 Ill. App. 577, defendant contracted to furnish coal as required by plaintiff. For failure to do so the court said:

"Appellee * * * was entitled to have his damages measured by the market values obtaining at the * * * times when he required the portions * * * in his season's business." Hill v. Chipman, 59 Wis. 211, 18 N. W. 160; Roper v. Johnson, L. R. 8 C. P. 167; 1 Sedgwick, Dam. 558.

It will therefore be for the jury to fix what according to the terms of the contract and its subject-matter—relevant facts and circumstances under which it was entered into and the plaintiff's course of business; orders received; the capacity of defendant's mill, if operated with due diligence—would be a reasonable quantity of extract plaintiff was entitled to call upon defendant to ship weekly, and the market price at which plaintiffs either did, or could have, filled such orders. The price to be paid defendant was fixed by the contract; the difference between such price and the price at which plaintiffs could have filled orders will be the measure of the damages which plaintiffs are entitled to recover. A basis may be stated for approximate ascertainment that will not work injustice to either party. No date is fixed for shipments in the first contract; "fairly regular shipments" being altogether indefinite and uncertain. The second contract affords the only basis of computation in saying that the quantity subject to the order of the plaintiffs should be reported once a week. Therefore, under the peculiar circumstances, the fairest measure would be the difference between the contract price and the average weekly market price from the date of the second contract, July 22, 1905, to the date when the whole 5,000 barrels would have been delivered if the defendant had used due diligence in the operation of his plant.

The jury should be instructed as follows: Ascertain from the testimony the weekly output which the defendant could have made and reported by due diligence. Divide the 5,000 barrels by the number of barrels so found as the proper weekly output, and you have the total number of weeks the defendant had to deliver. Ascertain from the testimony, for the weeks so found, the average weekly market price for a barrel. Take the difference between the agreed price and the average weekly market price so ascertained, and multiply by the number of barrels not shipped. The result will be the nearest approach to the actual damages.

We do not deem it necessary to pass upon several questions of practice presented in the bills of exception. They may not arise upon another trial. While we do not doubt that the pleadings are skillfully drawn, we cannot avoid the reflection that the real cause of action, the facts upon the proof of which the rights and defenses of both parties depend, might have been set out more concisely and the real issues presented more clearly to the court and jury. For the reasons set out, we are of the opinion that there was error in directing a verdict. There must be a new trial.

Reversed.