## KUTZTOWN FOUNDRY & MACHINE CO. v. SLOSS–SHEFFIELD STEEL & IRON CO.

(Circuit Court of Appeals, Third Circuit. March 4, 1922.)

No. 2691.

1. **Sales ☞384(2)—Measure of damages for breach of contract by purchaser.**

While it is the settled law that the measure of damages for breach of a contract for the purchase of a marketable commodity is the difference between the contract price and the market price at the time and place when and where delivery was to be made, such rule does not apply when delivery is deferred at the request of the buyer; but in that case the measure of damages is the difference between the contract price and the market price at the place of delivery at the time the buyer definitely refuses to accept delivery.

2. **Sales ☞88—Construction of contract is for the court.**

The construction of a written contract of sale and of subsequent correspondence relating thereto *held* for the court.

3. **Sales ☞177—Correspondence held not to have effected cancellation of contract.**

Correspondence relating to a contract for the sale and delivery of 200 tons of pig iron per month for six months, to be treated as a separate contract for each month, construed, and the contract *held* not to have been definitely canceled or repudiated by the buyer until delivery for the last month was due and tendered, where until that time the buyer con-

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tinuously requested that shipments be deferred and the price reduced, without explicitly refusing to accept delivery at a future time.

**4. Sales ⬡⟿69—Contract for sale of pig iron held not limited to iron of seller's own manufacture.**

A contract for the sale of pig iron to be delivered at seller's furnaces *held* not for manufacture and sale, but one under which the seller had the right to supply the iron from its own or other manufacturing plants.

**5. Appeal and error ⬡⟿1064(1)—Judgment not reversible for harmless error in instructions.**

A judgment will not be reversed, or a verdict set aside, because of error in the instructions, where it appears that no harm resulted to the complaining party.

In Error to the District Court of the United States for the Eastern District of Pennsylvania; J. Whitaker Thompson, Judge.

Action at law by the Sloss-Sheffield Steel & Iron Company against the Kutztown Foundry & Machine Company. Judgment for plaintiff and defendant brings error. Affirmed.

William A. Carr and Sidney L. Krauss, both of Philadelphia, Pa., for plaintiff in error.

Paul C. Wagner, William W. Montgomery, Jr., and Joseph S. Clark, all of Philadelphia, Pa., for defendant in error.

Before WOOLLEY and DAVIS, Circuit Judges, and LYNCH, District Judge.

DAVIS, Circuit Judge. The Kutztown Foundry & Machine Company, defendant below, is here seeking to reverse a judgment entered against it for breach of a contract, executed October 1, 1918, wherein plaintiff agreed to sell and defendant to purchase 1,200 tons of pig iron at $37 per ton, to be delivered 200 tons a month for the first six months of 1919 at the furnaces at Birmingham or Sheffield, Ala. Each month's deliveries were to be "treated as a separate contract, independent of deliveries for other months." The contract further provided that—

"In case of any default whatsoever of the seller in regard to installments herein mentioned, the buyer shall not, by reason thereof, be excused or released from any obligation in regard to other installments."

No shipments whatever were made under the contract. After the Armistice was signed, the price of iron began to fall, and by January, 1919, it had fallen to $34 per ton, by March to $29.75, and by June, the month in which the final shipment was to be made, to $27.75.

The fourteen assignments of error may be summarized in three propositions: (1) The proper measure of damages was the difference between the contract price and the market price of the iron at the end of each monthly contract. (2) It was error not to permit defendant to prove from plaintiff's records that it was unable to supply the iron it sold defendant from its own manufacture. (3) It was error to instruct the jury that the plaintiff in any event was entitled to nominal damages.

[1] 1. Taking up these propositions in order, every monthly delivery by express terms of the contract was to be "treated as a separate

contract, independent of deliveries for other months." As 200 tons of pig iron were to be delivered every month, for the months of January to June, inclusive, of 1919, there were, therefore, six separate contracts, just as distinct as if there had been but one contract for 200 tons. The law is well settled, both in this country and in England, that in such a case the measure of damages is the difference between the contract price and the market price at the time and place when and where the delivery was to be made. The time in this contract was the last day in every one of the first six months of 1919, and the places were the furnaces at Birmingham or Sheffield. Haff v. Pilling et al. (C. C.) 134 Fed. 294; Youghiogheny & O. Coal Co. v. Verstine Hibbard & Co. (C. C.) 176 Fed. 972; Roller v. George H. Leonard & Co., 229 Fed. 607, 143 C. C. A. 629; Brown v. Muller, 7 Court of Exch. 319.

But the difference between the contract price and the market price at the time fixed by the contract is not the measure of damages if the time stated in the contract for deliveries is deferred at the request of the defendant. Smith v. Snyder, 77 Va. 432; Ogle v. Vane, 2 Q. B. 275. The plaintiff contends that the defendant deferred the times of delivery, and the measure of damages was the difference between the contract price and market price in June, 1919, when the breach was committed and defendant definitely refused to take the iron. The defendant, on the other hand, says that it canceled the contract by its letter of February 13, 1919, and the measure of damages must be fixed as of that date and the learned trial judge erred when he charged the jury that—

"As a matter of law, the letter of February 13 does not amount to a refusal on the part of the defendant to accept deliveries under this contract. The plaintiff declined to consider it a cancellation, and the subsequent evidence in the case and the correspondence goes to show that the contract was not considered as being finally broken by either party until June, 1919."

[2, 3] The construction of the contract and correspondence was for the court. Foster v. Berg & Co., 104 Pa. 324; Sea Insurance Co., etc., v. Johnston, 105 Fed. 286, 44 C. C. A. 477; Goddard v. Foster, 84 U. S. (17 Wall.) 123, 21 L. Ed. 589. It will be necessary to examine the correspondence to determine whether or not the defendant canceled the contract by its letter, or thereafter deferred the times of delivery. On January 7th the defendant wrote plaintiff, saying among other things:

"Therefore you will please arrange not to ship any iron on account of contract we have with you for Sloss or Noala pig iron during the present month. As soon as we can determine our requirements for succeeding months, we will advise you."

There followed between defendant and plaintiff some correspondence, in which defendant sought to have plaintiff reduce the contract price for the iron, and on January 29th it wrote plaintiff saying:

"You will, of course, withhold all shipments of iron until the above matter is settled."

And again on February 5th it wrote:

"We are not in a position during the month of February to have you ship any iron on account of contract you have with us. We had hoped, however,

to be able to issue instructions early in March for at least a portion of this iron."

On February 13th it wrote a letter in which it claims that it canceled the contract in the following words:

"The purpose for which this iron was intended no longer exists. Therefore we have no use for it, and you may consider this a cancellation of the contract."

Plaintiff replied that it could not agree to the proposed cancellation and would insist upon the performance of the contract. If defendant had stood upon the position taken in its letter of February 13th, that date might have been considered the date of the breach. However, on March 29th, defendant sent a telegram to the plaintiff saying:

"Don't ship any iron until you hear from us next week."

And again on April 11th it wrote:

"With the canceling of contracts, and the small amount of business being done, it is not possible for us to take in any of this iron at this time. * * * If the revision in prices you may make will enable us to secure additional business, we may be able to order the pig iron with reasonable promptness; but, in the meantime, we must request that no iron be shipped us."

On May 7th it wrote, saying:

"At this time we will not require any shipment of your iron. Should we need any in the near future, we will advise you. In the meantime we cannot accept any shipments made."

On May 12th plaintiff wrote to defendant:

"This is a rather unsatisfactory reply to our letter of April 29th. You do not definitely state that you will not accept any iron shipped under the contract during the contract period. This iron is manufactured and stored on our yard at your request. We are ready to deliver the iron, and beg to tender the same herewith. You will kindly advise whether or not you will decline to accept the tender."

The record does not disclose any reply to that letter. Again on May 27th the plaintiff wrote defendant as follows:

"We beg to notify you that this 1,000 tons of iron, now undelivered, have been manufactured for you and are now stored in our yards at Birmingham, Ala., ready to be loaded on cars, and that we are ready, able, and willing to deliver the same to you as required by our contract. It is held by us subject to your orders, and we again request that you furnish us with shipping instructions. We again decline to further suspend the deliveries of this 1,000 tons, and we again offer to perform our contract as to this tonnage. We again tender this 1,000 tons of iron to you, and insist that you furnish us with the shipping instructions for this tonnage. The tonnage required to be delivered under this contract during the month of June, 1919, will be ready for delivery to you. We request that you furnish us with shipping instructions for this June tonnage. Unless shipping instructions for this June tonnage are furnished, we will be compelled to tender the same to you at the time delivery thereof is required to be made under the contract."

On June 4th defendant wrote, and among other things said:

"We want to be fair, and bring the matter to a definite understanding; so we make the following suggestion as the best we can do: Iron to be shipped only on our instruction, which will be given when business conditions warrant it. When shipments are resumed, the quantity ordered in will be

based on our output, and your quota will be on a percentage basis, as your contract bears to the total amount contracted for. * * * No iron will be accepted unless specific instructions are given by us to forward it in accordance with the above suggestion."

On June 6th plaintiff wrote that, in view of the letter of June 4th, it felt that it was necessary to tender the June quota. The following day plaintiff wrote, and, after referring to the contract and correspondence, said:

"We have always been able, ready, and willing to deliver to you the iron agreed to be delivered in strict accordance with the terms of this contract. We beg to notify you that this 1,200 tons of iron now undelivered, including the tonnage required to be delivered during the month of June, 1919, has been manufactured for you and is now stored on our yards at Birmingham, Ala., ready to be loaded on cars, and that we are ready, able, and willing to deliver the same to you under this contract. It is held by us subject to your orders, and we tender this 1,200 tons of iron to you, and insist that you furnish us with shipping instructions for the same."

In reply the defendant wrote:

"We have before us your letter of the 7th instant and would refer you to our letter of June 4th."

There were no further communications. As appears from the correspondence, plaintiff was insisting from time to time that defendant accept delivery of the iron in accordance with the contract, and the defendant, without definitely and unequivocally repudiating the contract and stating that it would not at any time in the future accept the iron, constantly sought to have the price reduced and defer delivery, intimating now and then that it might be in a position sometime to receive it. In our opinion the learned trial judge properly construed the correspondence, and there was no definite breach until June, 1919. The plaintiff had refrained from delivering the iron from month to month at the request of the defendant. During this time the price of iron had constantly fallen. Deliveries having been deferred at the request of defendant until June, when both parties treated the refusal of the defendant to take the iron as a definite breach, the measure of damages was the difference between the contract price and the market price at that time.

[4] 2. The question raised by the second proposition is based upon the assumption that the contract was for the *manufacture* and sale of the iron. Carrying that assumption into the argument, defendant says that it and plaintiff "entered into a written agreement whereby plaintiff was to *manufacture* and deliver 1,200 tons of pig iron." In speaking further of the agreement, counsel says: "It provided for the *manufacture* and sale of 1,200 tons of pig iron." And again: "The contract was one for the *manufacturing* and delivery of 1,200 tons of pig iron." The assumption is unwarranted, for the word "*manufacture*" is not mentioned in the whole contract, and the nearest approach to it is contained in the statement that delivery was to be made "f. o. b. railroad cars at furnaces at Birmingham or Sheffield, Alabama." That delivery was to be made at the furnaces does not, however, confine the sale to the manufactured product of the plaintiff. The agreement was expressly for the *sale* of the material, and not for the *manufacture*

*anc! sale* by the plaintiff. Accordingly the plaintiff was at liberty to go into the open market and purchase the pig iron required by the contract. The time of delivery having been deferred by defendant until the breach in June, the month in which final delivery was to be made, all that was required of plaintiff was to be able to deliver at that time, either from its manufactured or purchased product, the pig iron specified in the contract. Proof from the plaintiff's own records of the amount of pig iron it manufactured and shipped during that time would have been without significance. It was therefore incompetent, irrelevant, and immaterial.

[5] 3. The defendant challenges the proposition that the learned trial judge could submit the question of plaintiff's good faith and ability to perform to the jury, and at the same time charge it that plaintiff was entitled to recover nominal damages in any event. The jury returned a verdict of substantial damages. It necessarily found that plaintiff was acting in good faith and was able to perform its contract. In view of this finding the charge on this point, even if erroneous, and this we are not now deciding, was harmless error. It is a well-recognized rule that a judgment will not be reversed or a verdict set aside because of error, when it appears, as here, that no harm has resulted to the complaining party. Blashfield's Instructions to Juries (2d Ed.) 991; Board of Commissioners, etc., v. Keene Five-Cents Saving Bank, 108 Fed. 505, 515, 47 C. C. A. 464; Samulski v. Menasha Paper Co., 147 Wis. 285, 133 N. W. 142.

The judgment of the District Court is affirmed.